FILED
COURT OF APPEALS
DIVISION II

2015 MAR 24 AM 8: 33

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44952-8-II |
| Respondent, | |
| v. | |
| ARNOLD BROINES FLORES, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Arnold Flores appeals his convictions for assault in the second degree, kidnapping in the first degree, and six counts of unlawful imprisonment. Flores argues that there is insufficient evidence beyond a reasonable doubt to prove (1) that he abducted Yonhee Flores[1] by the use or threatened use of deadly force, (2) that he knowingly restrained employees and customers of the credit union in which the incident transpired, (3) that he substantially interfered with Kelly Flynn's liberty, and (4) that he was armed with a deadly weapon on the kidnapping count. Flores also argues the trial court erred when it failed to enter a written order dismissing charges. Lastly, Flores argues, and the State concedes, that the trial court erred by including in the judgment and sentence that the case involved a minor victim.

In his statement of additional grounds (SAG), Flores further asserts, in addition to the above, (1) ineffective assistance of counsel at trial; (2) prosecutorial misconduct; (3) trial court error for applying the wrong standard when considering his motion to dismiss; (4) a violation of his right against self-incrimination; and (5) trial court error for improperly calculating his offender score because it included a prior conviction of assault in the fourth degree, which he asserts should

---

[1] To avoid confusion, this opinion refers to Yonhee Flores by her first name. We intend no disrespect.

be reversed. We affirm Flores's convictions and remand for the trial court to correct the errors in the judgment and sentence.

FACTS PRESENTED AT TRIAL

Flores arranged to meet his estranged wife, Yonhee, at the Washington State Employees Credit Union in Lakewood on August 25, 2012. Yonhee arrived first and received assistance from credit union employee, Kelly Flynn. Flores arrived and interacted with Yonhee and Flynn in the credit union's lobby area. When Flynn started to walk away from Flores and Yonhee, Flores charged Yonhee and pushed her against a window. Flores pinned Yonhee with his forearm, placed a box cutter against her face, and cut her. Flores had an "evil" look on his face and Yonhee was scared. 3 Report of Proceedings (RP) at 122. Flores dropped the box cutter onto a chair. He and Yonhee fell to the floor and Flores choked her.

When Flores pulled Yonhee up from the floor, Yonhee saw Flores holding what appeared to be a gun. Flores continued to hold the gun in one hand while he pulled Yonhee around the lobby area, yelling at her. Flores told Yonhee that he was going to kill himself. The credit union's lobby contains an exposed cubicle area, a coin machine, a teller station, and chairs.

Once the incident began, Flynn joined Jyll Berg, another employee, in her office. They then moved back to the vault area and hit an alarm. Another employee, David Ohls, exited out the back door. Flynn did not exit out the back door with Ohls because she did not want to draw attention to herself. She believed Flores had a gun.

Customers Stephanie Crockett and her daughter, Brielle Eldridge were in the cubicle area when the incident began. They hid on the ground in a cubicle. Neither saw anything but both could hear everything. Neither felt they could have safely escaped because all routes were visible to Flores. Shawna Loomis, an employee, was at the first desk in the cubicle area exposed to the

lobby when the incident began. She hid behind a desk with Crocket and Eldridge for the duration of the incident. Loomis thought Flores would "see [her] and try [to] hurt [her]" if she attempted to leave. 4 RP at 363. She felt "trapped" inside the credit union by Flores. 4 RP at 366.

Deanna Erwin, an employee, was working as a teller in the lobby when the incident began. She witnessed Flores pin Yonhee with his forearm as he held an object in his hand. Erwin hid under the teller counter and was unable to leave without Flores seeing her. Alyssa Luther, an employee, was standing at the coin machine in the lobby when the incident started. Flores turned towards Luther, made eye contact with her, pointed the gun at her, and told her to call the police. After telling Luther to call the police, Flores turned to the left and said, "'*Everyone* get down.'" 4 RP at 381 (emphasis added). Luther called 911 and, because she was terrified, hid under the teller counter. She at first thought that she was going to die, but later realized that Flores was "there for [Yonhee] Flores." 4 RP at 393. Luther did not feel free to leave the credit union during the incident. Other employees also called 911.

Alison Odziemek, an employee, was in the lunch room when the incident began. She could hear Flores yelling but could only see him through a monitor. Albert Vital, an employee, was in the break room behind the teller counter when the incident began. He did not see the people involved in the incident, but could hear yelling and crying. Berg was in her office when the incident began. As she stood to walk out of her office, another employee motioned to her that Flores had a gun. Berg only saw a "glimpse" of the people involved in the incident. 4 RP 334. She stayed in the credit union during the incident because the only exit was through a hallway that exposed her to the lobby and Flores.

After law enforcement arrived, Flores moved Yonhee to the credit union's vestibule and told her to run. The officers shot Flores after he raised his gun toward Yonhee. Flores survived. Later, law enforcement discovered that Flores actually possessed a BB gun built as a replica of a Colt Defender firearm.

Detective Bryan Johnson and Sergeant Richard Hall interviewed Flores while he was in the hospital. During this interview, Flores admitted that he knew people inside the credit union would be afraid for their lives.

PROCEDURAL FACTS

The State charged Flores with one count of assault in the second degree,[2] one count of kidnapping in the first degree,[3] and eleven counts of unlawful imprisonment.[4] The State alleged aggravating factors[5] during the commission of the assault and kidnapping and that those charges involved domestic violence.[6] The State also specially alleged a deadly weapon enhancement[7] on every charge.

---

[2] RCW 9A.36.021(1)(c)

[3] RCW 9A.40.020(1)(a) and (d)

[4] RCW 9A.40.040

[5] RCW 9.94A.535(3)(h)

[6] RCW 10.99.020(5)

[7] RCW 9.94A.825

The parties held a confession hearing pursuant to CrR 3.5 to determine whether Flores's statements to law enforcement were admissible. The trial court concluded that his statements were admissible because he knowingly and voluntarily waived his *Miranda*[8] rights. During the hearing, the trial court ruled that a prior assault by Flores against Yonhee from April 2012 was inadmissible under ER 404(b).

During the trial but prior to resting, the State, without objection, moved to dismiss the unlawful imprisonment count relating to Ohls. The trial court granted the motion. At the close of the State's case in chief, Flores moved to dismiss all of the unlawful imprisonment counts, arguing that he did not knowingly restrain the bank employees or customers. The trial court dismissed the counts relating to Odziemek, Vital, and Berg. The counts involving individuals in the credit union's lobby area remained; however, the trial court dismissed the deadly weapon allegations relating to the unlawful imprisonment charges. Flores also moved to dismiss the count of kidnapping in the first degree, as well as the aggravators alleged for the assault and kidnapping. The trial court denied Flores's motions.

The jury found Flores guilty of assault in the second degree, kidnapping in the first degree, and six counts of unlawful imprisonment. The jury also returned special verdicts finding that Flores and Yonhee were members of the same household, and that Flores was armed with a deadly weapon during the commission of the assault and the kidnapping. The trial court sentenced Flores to a total of 211 months in custody.

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)

## ANALYSIS

### I. STANDARD OF REVIEW

Due process of law requires the State to prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction. *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

### II. KIDNAPPING

Flores argues that insufficient evidence existed to prove beyond a reasonable doubt that he abducted Yonhee by the use or threatened use of deadly force. He argues that he did not restrain Yonhee because he never used or threatened to use deadly force against her. We disagree because, when viewing the evidence in the light most favorable to the State, a rational trier of fact could have found Flores guilty beyond a reasonable doubt of kidnapping, i.e. that Flores abducted Yonhee by the use or threatened use of deadly force. *See Salinas*, 119 Wn.2d at 201.

The State charged Flores with kidnapping in the first degree, the elements of which are that Flores intentionally abducted Yonhee with intent to hold her as a shield or hostage, or to inflict extreme mental distress on her. RCW 9A.40.020(1)(a) and (d). Flores argues only that there is insufficient evidence to prove that Flores abducted Yonhee. "Abduct" means to restrain a person

by using or threatening to use deadly force. RCW 9A.40.010(1)(b). "Restraint" or "restrain" means to restrict another person's movements without consent and without legal authority in a manner that interferes substantially with that person's liberty. RCW 9A.40.010(6). Our Supreme Court defines deadly force as force which is "capable of, and entails great risk of, killing." *State v. Clarke*, 61 Wn.2d 138, 142, 377 P.2d 449 (1962). "[O]ne does not have to have the actual capability to inflict deadly force in order to *threaten* to use it within the meaning of abduction." *State v. Majors*, 82 Wn. App. 843, 847, 919 P.2d 1258 (1996).

Here, Flores assaulted Yonhee by threatening her and cutting her with the box cutter. He then dropped the box cutter into a nearby chair. He had easy access to it throughout the incident. And, Flores had already demonstrated an ability and willingness to use the box cutter to intimidate and physically harm Yonhee, and inferentially others. After the box cutter assault, Yonhee saw that Flores possessed what she believed to be a gun. Flores held on to Yonhee and pulled her around the lobby area while holding the gun in his other hand. Based on these facts, it is reasonable for a jury to infer that Flores threatened to use deadly force against Yonhee. He had ready access to the box cutter, he possessed what appeared to be a gun that he used in an intimidating manner, and he had physical control of Yonhee.

Flores further argues that he didn't threaten Yonhee with deadly force because she did not believe he intended to kill her. However, a victim's disbelief of a threat does not negate that threat. *Majors,* 82 Wn. App. at 847. Additionally, Yonhee testified that she had never seen such an "evil" look on Flores's face, and it wasn't until later in the incident that she realized he didn't want to kill her. 3 RP at 122. We hold that sufficient evidence existed to convict Flores of kidnapping Yonhee.

III.   UNLAWFUL IMPRISONMENT

A.   Knowingly

Flores argues that insufficient evidence exists to prove beyond a reasonable doubt that Flores knew he restrained credit union employees and customers. Therefore, Flores argues that his unlawful imprisonment convictions are unsupported by sufficient evidence. We disagree.

A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he is aware of that fact, circumstance, or result. RCW 9A.08.010(1)(b). If a person has information which would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted to find that he acted with knowledge of that fact. RCW 9A.08.010(1)(b).

Here, the trial court instructed the jury that, "A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result. . . . If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact." Clerk's Papers (CP) at 65. Knowledge can be proven by direct or circumstantial evidence. *State v. Allen*, ___ Wn.2d ___, 341 P.3d 268, 273 (2015).

To convict Flores of unlawful imprisonment, the State must prove that he knowingly restrained the movements of another person in a manner that substantially interfered with the other person's liberty, that the restraint was without legal authority, and that the restraint was without the other person's consent or accomplished by physical force, intimidation, or deception. RCW 9A.40.040. Viewed in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt, through the direct and circumstantial evidence, that Flores knew there

were people in the credit union, both employees and customers. The jury also could have found that Flores knew those people would not feel free to leave.

In support of his argument that he did not knowingly restrain the liberty of the persons in the credit union lobby, Flores cites only to *State v. Warfield*, 103 Wn. App. 152, 157, 5 P.3d 1280 (2000). In *Warfield*, bounty hunters had a good faith belief that they had legal authority to restrain and return a person to another state, and the state was required to prove that the defendant knew they lacked legal authority to restrain the victim. 103 Wn. App. at 154-55. Our Supreme Court recently clarified that "*Warfield's* holding is limited to those unique cases where the defendant had a good faith belief that he or she had legal authority to imprison a person." *State v. Johnson*, 180 Wn.2d 295, 304, 325 P.3d 135 (2014). As such, "[t]he *Warfield* court's logic does not extend to most unlawful imprisonment cases . . . where there is no indication that the defendants believed they actually had legal authority to imprison the victim." *Johnson*, 180 Wn.2d at 304.

Here, Flores's actions throughout the incident demonstrate that he had knowledge that other people were present in the credit union lobby and would not be free to leave. Flores arranged to meet Yonhee at the credit union during normal business hours. The trial court heard testimony that Flores was aware that employees and customers were present. Luther testified that she heard Flores say, "'*Everyone* get down.'" 4 RP at 381 (emphasis added). Additionally, in his statement to the police following the incident, Flores admitted that he knew people inside the credit union would be afraid for their lives.

Furthermore, the jury heard testimony that it would not be reasonable for an unarmed civilian to leave the credit union with an armed person situated in the lobby or entrance way. Crockett, Eldridge, Erwin, Loomis, Flynn, and Luther were all in the credit union's lobby area. Although Flores did not interact with each victim individually during the incident, he intimidated

9

every victim through his interactions with Yonhee and his generalized directions to "[e]veryone." 4 RP at 381. Flores's threatening behavior intimidated Crockett, Eldridge, Erwin, Loomis, Flynn, and Luther to a degree that each did not feel free to leave the credit union.

When viewing the direct and circumstantial evidence in the light most favorable to the State, a rational jury could conclude from this evidence that Flores knew about the presence of credit union employees and customers, and that they would not have felt free to leave after the incident began. Additionally, a rational jury could conclude that no reasonably safe means of escape existed for the customers and employees inside the credit union at the time of the incident. Because this direct and circumstantial evidence[9] supports the jury's finding that Flores acted with knowledge, the record contains sufficient evidence for a rational trier of fact to conclude that Flores unlawfully imprisoned Crockett, Eldridge, Erwin, Loomis, Flynn, and Luther (counts III, IV, VI, VII, IX, and XII).

B.      Substantial Interference with Flynn's Liberty

Flores also argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he unlawfully imprisoned Flynn. He argues that he did not substantially interfere with Flynn's liberty because a reasonable means of escape existed for her. We disagree.

As previously discussed, "restraint" or "restrain" means to restrict another person's movements without consent and without legal authority in a manner that interferes substantially with that person's liberty. RCW 9A.40.010(6). For restraint to be substantial, there must be a "'real' or 'material' interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." *State v. Robinson*, 20 Wn. App. 882, 884, 582

---

[9] The trial court correctly instructed the jury that direct and circumstantial evidence can have equal weight and value.

P.2d 580 (1978), *aff'd*, 92 Wn.2d 357, 597 P.2d 892 (1979). That the victim had an available avenue of escape is a defense to a charge of unlawful imprisonment unless "'the known means of escape . . . present[s] a danger or more than a mere inconvenience.'" *State v. Washington*, 135 Wn. App. 42, 50, 143 P.3d 606 (2006) (quoting *State v. Kinchen*, 92 Wn. App. 442, 452 n.16, 963 P.2d 928 (1998)). Even if there is a potential escape route, the defense fails where the victim does not believe she can leave or is fearful of trying to escape. *State v. Allen*, 116 Wn. App. 454, 466, 66 P.3d 653 (2003).

Flores cites *Kinchen*, 92 Wn. App. 442, in support of his argument that Flynn had the means and opportunity to escape. In *Kinchen*, the defendant locked the victims in an apartment and left them alone, but left a window and sliding glass door open. 92 Wn. App. at 452. The court found that the victims had a "reasonable and readily accessible means of escape." *Kinchen*, 92 Wn. App. at 452 n.16.

But here, no reasonably safe means of escape existed for Flynn. Flynn testified that she believed Flores had a gun. She retreated to the credit union's vault area where she encountered Ohls. Ohls escaped out the back door of the credit union, but the back door makes a sound as it opens. Flynn testified that she did not sneak out the back door with Ohls because she did not want to draw attention to herself. Based on these facts, it is reasonable for a jury to infer that Flynn did not believe she could freely leave and was too fearful to try to escape. *See Allen*, 116 Wn. App. at 466. Therefore, when viewing the evidence in the light most favorable to the State, a rational jury could find sufficient evidence to conclude that Flores unlawfully imprisoned Flynn.

IV.     DEADLY WEAPON ENHANCEMENT

Flores argues that the State failed to provide sufficient evidence to support the jury's special verdict that he was armed with a deadly weapon, the box cutter, during the commission of

the kidnapping. He argues that the State failed to prove a nexus between the weapon and the crime. We disagree.

To prove that Flores was armed with a deadly weapon during the commission of the kidnapping, the State had to prove beyond a reasonable doubt that the weapon was easily accessible and readily available for offensive or defensive use. RCW 9.94A.825. A deadly weapon is an implement or instrument that has the capacity to inflict death and, from the manner in which it is used, is likely to produce or may easily produce death. RCW 9.94A.825.

Possession can be actual or constructive. *State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994). To determine whether a defendant had constructive possession of an item, we examine the totality of the circumstances touching on dominion and control. *State v. Summers*, 107 Wn. App. 373, 384, 28 P.3d 780 (2001); *see also Staley*, 123 Wn.2d at 798. Dominion and control over the premises where the item was found creates a rebuttable inference of dominion and control over the item itself. *State v. Cantabrana*, 83 Wn. App. 204, 208, 921 P.2d 572 (1996). "A defendant's momentary handling of an item, along with other sufficient indicia of control, can support a finding of possession because the totality of the circumstances determines possession." *Summers*, 107 Wn. App. at 386. The focus is "not on the length of the possession but on the quality and nature of that possession." *Summers*, 107 Wn. App. at 386. In a constructive possession case, the State must also prove a nexus between the crime and the weapon. *State v. Johnson*, 94 Wn. App. 882, 895, 974 P.2d 855 (1999).

Here, the totality of the circumstances supports a finding of constructive possession of the box cutter. Additionally, the record contains sufficient evidence to support finding a nexus between the kidnapping and the box cutter. Flores used the box cutter to assault Yonhee. He then dropped it into a nearby chair. Flores remained in the lobby during the kidnapping and exercised

control over the premises through his use of fear and intimidation and his possession of the box cutter and the gun. He could have accessed the box cutter at any time during the incident, and he had already demonstrated an ability and willingness to use the box cutter to intimidate and physically harm Yonhee. Additionally, during the police interview, Flores told Officer Hall that he always carried a box cutter with him. When viewing the facts in the light most favorable to the State, a rational jury could find beyond a reasonable doubt that there was a connection between the defendant, the weapon, and the crime. *See State v. Eckenrode*, 159 Wn.2d 488, 495, 150 P.3d 1116 (2007). And, that Flores was armed with the box cutter during the commission of the kidnapping for purposes of a special verdict.

## V.     JUDGMENT AND SENTENCE

### A.     Dismissed Counts

Flores argues that we should remand because the trial court did not enter a written order dismissing counts V, VIII, X, and XI following the State's case in chief. He correctly argues that the trial court should have indicated in the judgment and sentence its oral dismissal of the counts for the State's failure to present a prima facie case. The trial court sentenced Flores for each conviction: assault in the second degree, kidnapping in the first degree, and six counts of unlawful imprisonment. The judgment and sentence form contained a line reading, "The court DISMISSES Counts" followed by a blank. CP at 156. The trial court did not enter any counts into the blank space. We remand to correct this inadvertent error.

We note that in *State v. Davis*, we did not remand to enter a written order or note dismissal of counts on the judgment. 176 Wn. App. 849, 887, 315 P.3d 1105 (2013), *reversed on other grounds*, 179 Wn.2d 1014 (2014). However, in that case, we declined remand because the appellant failed to cite authority requiring such. Additionally, we cited to no authority *prohibiting*

13

remand. Washington is a written order state and a trial court's oral decision has no binding or final effect unless it is formally incorporated into the findings of fact and conclusions of law, and the judgment and sentence. *State v. Dailey*, 93 Wn.2d 454, 458-59, 610 P.2d 357 (1980); *State v. McReynolds*, 142 Wn. App. 941, 949, 176 P.3d 616 (2008) (a written order constitutes an acquittal). Thus, we remand to the trial court to correct the judgment and sentence to reflect the dismissed counts V, VIII, X, and XI.

      B.     Scrivener's Error

Flores argues and the State concedes that the trial court checked a box on the judgment and sentence stating that the case involved a kidnapping or unlawful imprisonment where the victim is a minor.[10] There is no evidence in the record that any minor was present. Erroneous sentences may be challenged for the first time on appeal. *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). Flores does not argue that he was prejudiced by the error and there is nothing in the record to suggest he was prejudiced. Therefore, the remedy for a scrivener's error in a judgment and sentence is to remand to the trial court for correction. *State v. Moten*, 95 Wn. App. 927, 929, 935, 976 P.2d 1286 (1999). We accept the concession and remand to the trial court to correct the judgment and sentence by removing the finding that the case involved a minor victim.

VI.    STATEMENT OF ADDITIONAL GROUNDS

Flores raises several issues in his SAG. He asserts (1) his counsel was ineffective at trial, (2) the trial court erred when it erroneously indicated a minor victim on the judgment and sentence, (3) prosecutorial misconduct, (4) the trial court applied the wrong standard when considering his

---

[10] Flores additionally argues in his SAG that his counsel allowed the trial court to make the error and that the trial court "deliberately marked : . . the said conviction for the purpose of imposing tormenting punishment on [Flores] during prison confinement." SAG at 3. Nothing in the record indicates that Flores's counsel knew of the error or the intention of the trial court.

motion to dismiss, (5) his unlawful imprisonment convictions were not supported by substantial evidence, (6) his Fifth Amendment right against self-incrimination was violated, (7) his prior conviction for assault in the fourth degree should be reversed, and (8) the trial court erred by adding his prior assault in the fourth degree conviction to his offender score. Flores's judgment and sentence error and unlawful imprisonment issues are addressed above. We address each remaining assertion in turn and hold that these claims lack merit.

A.       Ineffective Assistance of Counsel

Flores asserts that his trial counsel was ineffective, thereby prejudicing him. A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700. An attorney's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance prejudices a defendant if there is a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To rebut this presumption, a defendant bears the burden of establishing the absence of any legitimate trial tactic explaining counsel's performance. *Grier*, 171 Wn.2d at 33. Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). We hold that Flores's counsel did not render ineffective assistance.

15

### 1.    Character Evidence

Flores first asserts that his counsel "deliberately confined or covered up" evidence of Yonhee's gambling and her "manipulation of [d]omestic [v]iolence law" by declining to pursue or introduce ER 404(a)(2) character evidence. SAG at 2. Without deciding the admissibility of this evidence, it would have only impeached Yonhee's testimony. Because so many other witnesses testified to the events that occurred during the August 25, 2012 incident, there is no reasonable probability that the outcome of the trial would have differed if Flores's counsel attempted to introduce evidence of Yonhee's character. Even if his counsel was deficient by failing to impeach Yonhee, Flores was not prejudiced. Therefore, it was not ineffective assistance of counsel.

### 2.    Diminished Capacity

Flores asserts that his counsel was deficient because he did not ask for a diminished capacity instruction. To show ineffective assistance of counsel based on the failure to propose a jury instruction, the defendant must show (1) that he was entitled to the instruction, and (2) that the failure to request the instruction was not a legitimate tactical decision. *State v. Powell*, 150 Wn. App. 139, 154-55, 206 P.3d 703 (2009). First, we must determine whether Flores was entitled to a diminished capacity instruction. *State v. Cienfuegos*, 144 Wn.2d 222, 228, 25 P.3d 1011 (2001). Then, whether it was ineffective assistance of counsel per se to not request the instruction, and whether Flores was prejudiced. *Cienfuegos*, 144 Wn.2d at 228. But Flores did not submit any evidence that he was incapable of forming the requisite intent due to cognitive impairment. Because evidence is insufficient to support a diminished capacity instruction, Flores was not entitled to the instruction, and his counsel was not ineffective for not requesting the instruction.

16

### 3. Unprofessional Conduct

Flores next asserts that his counsel rendered unprofessional conduct throughout the trial because "he was more concern [sic] about if the police shooting was rightfully justified or not." SAG at 3. Although RAP 10.10(c) does not require Flores to refer to the record or cite authority, he is required to inform us of the "nature and occurrence of the alleged errors." Flores does not identify any specific acts of alleged unprofessional conduct or argue how such acts prejudiced him. His assertion of error is too vague to allow us to identify the issues and we do not reach them.

### 4. Motion to Suppress

Flores asserts his counsel failed to suppress Flores's statements to officers while in the hospital recovering from his gunshot injuries. The parties held a CrR 3.5 hearing to determine whether Flores's statements to law enforcement were admissible. The trial court concluded that his statements were admissible because he knowingly and voluntarily waived his *Miranda* rights. The record is clear that Flores's counsel adequately cross-examined witnesses and provided sufficient argument to the trial court to suppress Flores's statements during the CrR 3.5 hearing. Therefore, this assertion fails.

### 5. Failure to Call a Witness

Flores asserts that his counsel "failed for not obtaining witnesses in favor of the defense." SAG at 3. Flores does not identify any additional witnesses his counsel should have obtained or what testimony they may have offered. Any fact related to the investigation and decision to call witnesses is outside of the record on appeal. We do not address issues relying on facts outside the record on direct appeal. *McFarland*, 127 Wn.2d at 335, 338 n.5.

B.    Prosecutorial Misconduct

Flores asserts that the State prosecutor acted vindictively and retaliated against Flores by adding charges in the second amended information. The crux of Flores's argument is that he was deprived of his due process rights because the prosecutor's decision to add an additional criminal count and sentencing enhancements amounted to prosecutorial vindictiveness. We disagree.

We will reverse a conviction due to prosecutorial misconduct only if the defendant establishes that the "'conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). Constitutional due process principles prohibit prosecutorial vindictiveness. *State v. Korum*, 157 Wn.2d 614, 627, 141 P.3d 13 (2006). "'[A] prosecutorial action is 'vindictive' only if [it is] *designed* to penalize a defendant for invoking legally protected rights.'" *Korum*, 157 Wn.2d at 627 (quoting *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987). Actual vindictiveness must be shown by the defendant through objective evidence that a prosecutor acted in order to punish him for standing on his legal rights. *Meyer*, 810 F.2d at 1245. A presumption of vindictiveness arises when a defendant can prove that "'all of the circumstances, when taken together, support a realistic likelihood of vindictiveness.'" *Korum*, 157 Wn.2d at 627 (quoting *Meyer*, 810 F.2d at 1245). The mere filing of additional charges after a defendant refuses a guilty plea cannot, without more, support a finding of vindictiveness. *Korum*, 157 Wn.2d at 629, 631.

Here, the context of the State's amended information does not support Flores's assertion of vindictiveness. Probable cause supported the amended charges and Flores does not assert that the prosecutor lacked probable cause for the additional kidnapping charge or sentencing enhancements. *See Korum*, 157 Wn.2d at 632-33. Flores never raised such an assertion either before or after trial, so the trial court was never asked to strike the additional charges or to find

18

prosecutorial vindictiveness. The State has discretion to determine the number and severity of charges to bring against a defendant. *State v. Rice*, 174 Wn.2d 884, 901, 279 P.3d 849 (2012). The mere fact that the State filed an amended information does not amount to actual vindictiveness, and there is no evidence in the record to support a presumption of vindictiveness. Therefore, we find that the State did not act vindictively or retaliate against Flores.

C.     Motion to Dismiss

Flores appears to assert that the trial court applied the wrong standard when considering his motion to dismiss counts III through XII, as well as the aggravators alleged for counts I and II, for the State's failure to present a prima facie case. However, once a jury has issued a verdict, we do not review the trial court's decision on a motion to dismiss. *State v. Jackson*, 82 Wn. App. 594, 609, 918 P.2d 945 (1996). And, to the extent that Flores is actually arguing that the standard employed by the trial court relieved the State of its burden to provide all elements of the unlawful imprisonment charges and sentencing enhancements beyond a reasonable doubt, his argument lacks merit. The trial court properly instructed the jury on the State's burden of proof. Accordingly, the trial court did not relieve the State of its burden to prove the essential elements of either the unlawful imprisonment charges or the sentencing enhancements beyond a reasonable doubt.

D.     Fifth Amendment

Flores asserts that Officers Johnson and Hall violated his Fifth Amendment right against self-incrimination when they conducted a custodial interrogation of Flores in the hospital following the incident.[11] A manifest constitutional error may be raised for the first time on appeal. RAP 2.5(a). We hold that the trial court did not err by admitting evidence of Flores's statements to police at trial.

We review the trial court's findings of fact from a CrR 3.5 hearing to determine if they are supported by substantial evidence. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review de novo whether the trial court's conclusions of law are properly derived from its findings of fact. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012). We defer to the trial court's evaluation of witness credibility. *State v. Johnson*, 94 Wn. App. 882, 897, 974 P.2d 855 (1999). A waiver of *Miranda* rights is knowing and intelligent if the officer orally advises the defendant of his rights, the defendant indicates he understands his rights, and the defendant volunteers information. *Johnson*, 94 Wn. App. at 897-98.

Here, Detective Johnson testified that he and Sergeant Hall spoke with Flores's surgeon, who advised that Flores was in condition to speak and answer questions appropriately. Additionally, medical staff told them that Flores was not on any sedating medication. Detective Johnson and Sergeant Hall asked Flores orientation questions and were satisfied that he was sufficiently coherent and oriented to continue questioning. Detective Johnson read Flores his *Miranda* rights from a printed form. The officers asked Flores to paraphrase each right in his own words back to them and tell them what it meant to him. For example, when they advised Flores

---

[11] Within this argument, Flores also asserts that the police were unjustified in shooting him. We will not address this issue.

20

of his right to remain silent, Flores said he understood and that it meant "don't have to talk." 1-2 RP at 41. Flores then said "yes" he wished to voluntarily answer questions. 1-2 RP at 42. Sergeant Hall's testimony corroborated Detective Johnson's. Though Flores testified that he had no recollection of the interview, the trial court found Detective Johnson's and Sergeant Hall's testimony more credible than Flores.

A statement is knowingly, intelligently, and voluntarily made if the defendant was advised of his rights, and understood them, prior to making the statements. *Johnson*, 94 Wn. App. at 897-98. Johnson's and Hall's testimony establishes that Flores was advised of his rights and that he understood those rights prior to making any statements. Therefore, substantial evidence supports the trial court's determination that Flores made the statements knowingly, intelligently, and voluntarily. The trial court did not err by admitting evidence of Flores's statements.

E.      Prior Conviction

Flores asserts that he should not have been convicted of assault in the fourth degree in another case from April 2012. He asks us to reverse the conviction. This issue pertains to a matter outside the record that we cannot address on direct appeal. *McFarland*, 127 Wn.2d at 335, 338 n.5.

F.      Offender Score

Flores asserts that because his prior conviction should be reversed, it should not constitute one point on the offender score at sentencing. The trial court found that the State proved the prior conviction by a preponderance of the evidence. Flores does not assign error to the trial court's calculation of his offender score, only that his prior conviction is erroneous. As discussed above, we cannot address Flores's prior conviction on appeal because it pertains to a matter outside the record. *See McFarland*, 127 Wn.2d at 335, 338 n.5.

We affirm Flores's convictions and remand to correct the errors in his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Bjorgen, A.C.J.

Maxa, J.