[No. 40938-7-I. Division One. March 29, 1999.]
THE STATE OF WASHINGTON, *Respondent*, v. MATTHEW DANNY JOHNSON, *Appellant*.

*Douglas A. Stratemeyer,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Kristin J. Chandler, Deputy,* for respondent.

AGID, A.C.J. — Matthew Johnson appeals his Violation of the Uniform Controlled Substances Act (VUCSA) conviction, alleging that the trial court erred in (1) admitting evidence seized in violation of RCW 10.31.040, the "knock and announce" rule; (2) denying his motion to dismiss the deadly weapon allegation because his weapon was not easily accessible at the time of arrest; (3) denying his motion to suppress statements made without a valid waiver of *Miranda* rights, *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966); (4) improperly instructing the jury on accomplice liability; and (5) admitting into evidence currency seized from his apartment safe. Because the trial court erred in allowing the jury to consider the deadly weapon issue, we reverse the sentence enhancement. We find no other error and therefore affirm the underlying conviction.

## FACTS

On August 11, 1994, at 7:45 P.M., Detective Howard Gordon and several other police officers executed a search warrant on Johnson's Burien apartment which he shared with Ethel Washington. Detective Gordon testified[1] that he knocked on the door and announced "King County police with a search warrant." He then waited a couple of seconds and repeated the announcement. He did not recall if he demanded that the occupants open the door. When he heard movement on the other side of the door, he "felt the individuals in the apartment were either destroying evidence or possibly arming themselves," so he instructed Detective Gaddy to force the door open. Once inside, Detective Gordon saw Johnson running from the living room toward the bathroom and Washington running toward the bedroom. He followed Washington into the bedroom and saw her throw an object, later identified as a plate, out the bedroom window. The plate contained heroin residue. The officers also found balloons in the bedroom that appeared to contain heroin. Miriam Parangot of the Washington State Patrol crime lab confirmed that the substance found in the balloon, and in a plastic bag, was heroin. In addition, police discovered a safe inside the apartment which contained bundles of cash totaling $8,034, along with several watches, rings, and bracelets.

Detective Glenn Edmondson also testified that there were two knocks and announcements of police presence, and that approximately 10 seconds passed between the first knock and the forcible entry. He was unsure whether any movement occurred in the apartment before they entered. When he entered the apartment, he saw Johnson standing between the bathroom and living room. He "pulled him from the hallway into the living room . . . put him down on the floor . . . and advised him of his constitutional rights." After Detective Edmondson read Johnson his *Miranda* rights and he "indicated he understood those

---

[1]These facts are compiled from testimony given at both the pretrial hearings and at trial.

rights," he moved Johnson to a table between the living room and the dining room. Soon after, an officer brought Washington into the living room, and Detective Gordon read them both their rights. After stating again that he understood his rights, Johnson told the police to leave Washington alone because she "didn't have anything to do with it."

Detective Edmondson then asked Johnson if there were any weapons in the residence, and Johnson replied that there was one in the "book case," by which he meant the coffee table in front of the couch. The coffee table had two doors that opened onto a space underneath where books or magazines could be stored. The gun was inside the enclosed area on top of a pile of magazines. At the time, Johnson was handcuffed and seated between the living room and the dining room, and the gun was five to six feet away from where he was sitting.

Johnson testified that he was in bed in the bedroom, half asleep, when he heard a knock and an announcement. Two seconds later, police forced the door and "the dogs came in at the same time . . . ."[2] Johnson jumped up and ran out to the hallway where Detective Edmondson stopped and arrested him. Johnson testified that no one read him his *Miranda* rights, and the officers would not let him see the search warrant. It was only when they were leaving the house to go to the jail that Johnson says Detective Edmondson finally informed him of his rights.

The State charged Johnson with two VUCSA violations, each count alleging that he was armed with a deadly weapon at the time of the crime. The jury found that Johnson was armed and convicted him of one count of possession of heroin with intent to deliver and one count of possession of cocaine.

---

[2]Although Washington's testimony corroborated Johnson's claim that the officers entered almost simultaneously with their announcement, Washington's judgment may have been impaired by the heroin she admitted ingesting approximately one hour before the search occurred.

## DISCUSSION

### 1. Compliance With the "Knock and Announce" Rule

 Johnson first contends that the police conducted an illegal search of his home because they did not wait a reasonable time after knocking and announcing their presence before forcibly entering his apartment. Absent exigent circumstances,[3] RCW 10.31.040 requires officers executing a search warrant to knock, announce their identity and purpose, demand admittance, and give the occupants a reasonable time to voluntarily admit them.[4] Failure to comply with the "knock and announce" rule renders the entry illegal, and any evidence seized during the search inadmissible.[5] A police officer who identifies himself and announces that he has a search warrant has implicitly demanded admission.[6] Because it is undisputed that the officers identified themselves and stated they had a search warrant, the issue is whether the officers waited a sufficient time between the announcement and the forced entry.

 The trial court found that Detective Gordon waited from five to ten seconds after announcing his presence and purpose before knocking again and repeating the announcement. The court also found that Detective Gordon heard quick movement or rapid scurrying inside the apartment which did not sound like people were moving toward the door, and that the officers had reason to believe that the occupants may have been trying to discard evidence. While slightly conflicting testimony was offered on each of these points, substantial evidence supports the trial court's findings. We also defer to the trial court's resolu-

---

[3]Neither party alleges that exigent circumstances were present here.

[4]*State v. Garcia-Hernandez*, 67 Wn. App. 492, 495, 837 P.2d 624 (1992). RCW 10.31.040 provides:

> To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance.

[5]*State v. Coyle*, 95 Wn.2d 1, 621 P.2d 1256 (1980).

[6]*See State v. Lehman*, 40 Wn. App. 400, 404, 698 P.2d 606, *review denied*, 104 Wn.2d 1009 (1985).

tion of factual issues because it sits " 'closest to the trial scene and [is] thus afforded the best opportunity to evaluate contradictory testimony.' "[7]

Whether an officer waited a reasonable time before using force to enter a residence depends on the circumstances of the case.[8] To determine whether police officers have complied with the "knock and announce" rule, the trial court must decide whether, before the nonconsensual entry, the officers' conduct effectuated the purposes of the rule. They are (1) to reduce the potential for violence to both occupants and police; (2) to prevent unnecessary destruction of property; and (3) to protect the occupants' right to privacy.[9] But the right of privacy is severely limited when the police have satisfied the Fourth Amendment's probable cause and warrant requirements, as the officers did in this case, and destruction of property is permitted when necessary.[10] Suspicious noises and the possibility that evidence is being destroyed are factors courts have looked at to determine whether there was sufficient time between announcement and entry to comply with the knock and announce rule.[11]

Johnson relies on *State v. Edwards* to argue the police violated his rights when they "kicked in the door simultaneously with knocking and announcing their identity." He cannot rely on *Edwards* for two reasons. First, as previously noted, the trial court found that five to ten seconds passed between the first announcement and the forcible entry, so the knock and entry were not simultaneous. Second, in *Edwards*, the police knocked without saying anything, and then "as they identified themselves, kicked

---

[7]*State v. Hill*, 123 Wn.2d 641, 646, 870 P.2d 313 (1994) (quoting *Haynes v. Washington*, 373 U.S. 503, 516, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963)).

[8]*State v. Edwards*, 20 Wn. App. 648, 651, 581 P.2d 154 (1978).

[9]*Coyle*, 95 Wn.2d at 5.

[10]*State v. Myers*, 102 Wn.2d 548, 554, 689 P.2d 38 (1984).

[11]James O. Pearson, Annotation, *What Constitutes Compliance With Knock-and-Announce Rule in Search of Private Premises—State Cases*, 70 A.L.R.3D 217, 247-52 (1976).

in the door."[12] Here, Detective Gordon identified himself with both knocks.

This case is more analogous to *State v. Schmidt*,[13] where we held that the following circumstances justified a three-second delay between the knock and the forcible entry: barking dogs may have alerted the occupants to the officers' presence, the people inside suddenly became very quiet, the building was small and police had reason to suspect the occupants were armed and/or concealing evidence.[14] Here, the police sought drug evidence which can easily be destroyed, and Detective Gordon testified that he suspected just that when he heard Johnson and Washington run away from the door. Detective Gordon's suspicions were correct: Washington had time to get out of bed, pick up a saucer containing heroin residue, and throw it out the window during the time between the first police announcement and entry. Under these circumstances the trial court properly concluded that the officers waited a reasonable time and complied with the knock and announce rule.

## 2. Deadly Weapon Allegation

Johnson next contends that the trial court should have dismissed the deadly weapon allegation because he was not armed at the time of the crime and his arrest. Detective Gordon testified that when the police entered Johnson's apartment, Johnson and Washington were running "from the living room," in different directions—Washington toward the bedroom, and Johnson toward the bathroom. After the police handcuffed Johnson, they "took him into the living room,"[15] and sat him down. When the police asked

---

[12]*Edwards*, 20 Wn. App. at 652.

[13]48 Wn. App. 639, 740 P.2d 351, *review denied*, 109 Wn.2d 1013 (1987).

[14]*Id.* at 646.

[15]The trial court's written Conclusions of Law, filed on September 24, 1998, (two years after the hearings occurred) stated that both Johnson and Washington were on the couch at this time. But neither the record nor the trial court's oral ruling supports the conclusion that Johnson was seated on the couch. The trial

Johnson if there were any loaded weapons in the residence, he replied that there was a weapon inside the cabinet compartment of a coffee table in front of the couch. At that time, the handgun was "within five to six feet of him." On the basis of this information, the State included a deadly weapon sentence enhancement in its charge.

RCW 9.94A.125 authorizes sentence enhancement whenever a defendant or an accomplice is armed with a deadly weapon during the commission of an offense.[16] People are entitled to have weapons at home, and the State cannot use the fact of possession against that person in a trial for an unrelated crime.[17] But the right to bear arms is subject to reasonable regulation and does not apply to one who is in the process of committing a crime.[18] A person is "armed" if "a weapon is easily accessible and readily available for use, either for offensive or defensive purposes."[19] But a person is *not* armed simply because a weapon is present during the commission of a crime; there must be some nexus between the defendant and the weapon.[20] Whether a person is armed is a mixed question of law and fact which we review de novo.[21]

At trial, Johnson argued that instructing the jury on the

court stated only that Johnson and Washington were in the living room, and Detective Edmondson clearly indicated that Johnson remained in the chair between the living room and dining room. Although Detective Gordon vaguely stated that he "believed" that Johnson and Washington were seated on the couch when he read them their rights, this statement is not itself sufficient to support the finding.

[16]*State v. Bilal*, 54 Wn. App. 778, 782, 776 P.2d 153, *review denied*, 113 Wn.2d 1020 (1989).

[17]*State v. Rupe*, 101 Wn.2d 664, 706-07, 683 P.2d 571 (1984).

[18]*State v. Taylor*, 74 Wn. App. 111, 125, 872 P.2d 53, *review denied*, 124 Wn.2d 1029 (1994) (citing *State v. Sabala*, 44 Wn. App. 444, 449, 723 P.2d 5 (1986)).

[19]*State v. Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993).

[20]*State v. Mills*, 80 Wn. App. 231, 236, 907 P.2d 316 (1995).

[21]After we issued this opinion, the State filed a motion for reconsideration which argued that this standard of review, set forth in *Mills* and proposed by both the State and Johnson, is incorrect. It now asserts that we erred by not applying the "sufficiency of the evidence" standard to determine whether the State presented "any" evidence to support the conclusion that Johnson was armed. In addition to misstating the sufficiency standard, the State's argument assumes

deadly weapon charge would ensure that "if you have a gun anywhere in the house, you [have] a deadly weapon," while the State alleged that because "there was nothing impeding any access" to the gun, it was "readily available" as required by Washington law. The judge ruled that this issue should go to the jury, but expressed some doubt about his ruling:

> [T]he courts of appeal have not given me yet a real clear direction on what it is to be armed . . . . I believe . . . our courts . . . would likely find this fact situation falls within one that can to go the jury. I am not saying that I would vote that way were I on the court of appeals, but I think that is the present state of the law. And, therefore, I will let the issue go to the jury and let—if the jury resolves it, then let the appellate court decide which side of the line this is on.

The "easily accessible and readily available" standard originated in *State v. Sabala* where we held that a person driving a car who possessed heroin with intent to deliver and had a loaded gun under his seat was armed for purposes of the sentence enhancement statute.[22] Applying the deadly weapon statute did not violate Sabala's constitutional right to bear arms because police found the defendant with a "pistol . . . placed on the floorboard in such a manner as it was easily accessible to the driver of the vehicle."[23] There was thus a sufficient nexus between the position of the gun and the defendant while he was committing the crime to find he was armed.

---

that the two standards are mutually exclusive. "Whether there is evidence legally sufficient to go to the jury is a question of law . . .", *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980), and questions of law are reviewed de novo. In reviewing the sufficiency of the evidence in a criminal case, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). We were asked to determine whether the State presented evidence sufficient for a rational trier of fact to conclude that Johnson was armed at the time of his crime. After independently viewing the facts before the trial court in the light most favorable to the State, we decided that the State's evidence was legally insufficient to support such a conclusion. The State's motion, therefore, asks us to adopt the very standard we applied.

[22]*State v. Sabala*, 44 Wn. App. 444, 449, 723 P.2d 5 (1986).

[23]*Id.* at 446.

Since *Sabala*, Washington courts have applied this "easily accessible" standard to weapons discovered in homes and apartments. In *State v. Valdobinos*, the Supreme Court ruled that a defendant charged with delivery of controlled substances was not armed simply because there was an unloaded rifle under a bed in the bedroom.[24] And in *State v. Call*, this court concluded that two guns in a bedroom dresser drawer and one in a tool box at the foot of the bed were not easily accessible to a defendant charged with a drug crime.[25] Unless the defendant had access to the guns, there was no nexus between the weapons and the crime, and there was no actual threat to the arresting officers from the mere presence of weapons on the premises.

In *State v. Taylor* we held that Taylor, another drug defendant, was armed when his gun was in a bag lying on top of a table next to where he was sitting when police arrested him.[26] The *Taylor* court reasoned that even though the defendant had not tried to access his weapon, the situation was similar to the one in *Sabala* because the close proximity between the defendant and the weapon provided the required nexus.

Here, the State argued, and the trial court agreed, that Johnson's case is analogous to *Taylor*. But the *Taylor* court itself distinguished the two situations:

> This might be a different case if the gun had been found in a drawer or other location in Taylor's house. Because the weapon was sitting on the table next to Taylor, however, the jury was entitled to conclude that it was readily available and accessible to his use.[27]

Police found Johnson's weapon in a cabinet compartment five to six feet away from him, and Johnson was handcuffed at the time. Because there was no realistic possibility that

---

[24]122 Wn.2d 270, 282, 858 P.2d 199 (1993).

[25]75 Wn. App. 866, 869, 880 P.2d 571 (1994).

[26]74 Wn. App. 111, 872 P.2d 53, *review denied*, 124 Wn.2d 1029 (1994).

[27]*Taylor*, 74 Wn. App. at 126.

he could access his gun, we hold that Johnson's jury should not have been allowed to consider the question of whether Johnson was armed.

We cannot reconcile our holding here with the recent decision in *State v. Simonson*.[28] *Simonson* abandons the proximity rationale for one that allows the court to find a defendant "armed" with a deadly weapon where a weapon is present on the premises during a crime that continues over a period of time. The *Simonson* court concluded that the mere presence of loaded guns on Simonson's premises during the six-week period he was manufacturing methamphetamines was sufficient to find he was armed at the time of his offense.[29] The court reached this conclusion even though the defendant was in jail at the time police discovered the meth lab and therefore was nowhere near the seven weapons they found in his trailer. It explained that because Simonson was involved in a continuing offense, it was "reasonable to infer that the purpose of so many loaded guns was to defend the manufacturing site in case it was attacked."[30] Implicit in this analysis is the court's view that in ongoing crimes, the "readily available for use" standard is satisfied by a showing that the defendant could possibly have accessed his weapon at any point during the period of the offense.

In our view, the *Simonson* court has expanded the deadly weapon inquiry to include the entire span of alleged criminal activity, a result that diverges from precedent and ignores the constitutional foundation for the rule adopted in *Sabala*. Simply constructively possessing a weapon on the premises sometime during the entire period of illegal activity is not enough to establish a nexus between the crime and the weapon. Without that nexus, we run the risk of convicting a defendant under the deadly weapon en-

---

[28] 91 Wn. App. 874, 881, 883, 960 P.2d 955 (1998).

[29] *Id.* at 883.

[30] *Id.* While we recognize this is a reasonable inference, the State certainly did not prove it beyond a reasonable doubt.

hancement for having a weapon unrelated to the crime.[31] The theory behind the deadly weapon enhancement is that a crime is potentially more dangerous to the victim, bystanders or the police if the defendant is armed while he is committing the crime because someone may be killed or injured. Thus, the crime is more serious than it would have been without the weapon. Where no officers, victims or bystanders are present, the potential danger is also absent, and the rationale for greater punishment based on greater danger to others does not apply. The underlying rationale can apply only where there is a possibility the defendant would *use* the weapon. Hence, the *Sabala* and *Taylor* courts required proximity between the defendant and the weapon when applying the deadly weapon statute and its enhanced punishment to drug crimes.

In these cases, the deadly weapon enhancement should be applied only where it furthers its intended purpose of enhancing officer safety during Fourth Amendment searches and seizures. The *Sabala* court recognized that even if a defendant is not technically armed, a weapon intentionally positioned to provide easy access still poses a threat. The *Taylor* court later observed that regardless of whether it was intentionally accessible, a weapon's close proximity to the defendant can support the enhancement because it serves the same purpose. In each of these drug possession cases, the only people endangered by the defendant's weapon possession were arresting officers. It follows that if the defendant is not near his weapon when an officer discovers a crime, the purposes of the deadly weapon sentence enhancement are not implicated.

Even as applied to perfected crimes, the *Simonson* court's failure to require a nexus between the crime and weapon possession creates a danger of intrusion on defendants' constitutional right to bear arms.[32] For instance, a defendant charged with domestic abuse would be subject to an enhanced sentence if he could have accessed his weapon at

---

[31]*State v. Rupe*, 101 Wn.2d at 706-07.

[32]*Id.*

any time during the course of an ongoing pattern of abuse. In our view, this absolute prohibition on weapon possession by one who commits a crime on the premises where a weapon is located was not what the Legislature intended when it enacted the deadly weapon sentence enhancement. We therefore decline to follow *Simonson* and adhere to the rule of *Sabala* and *Taylor.* Because Johnson was handcuffed and the gun was well outside his reach, the gun was not easily accessible and the required nexus between the crime and the weapon was absent. These facts do not support the deadly weapon sentence enhancement, and it is reversed.[33]

### 3. Admissibility of Statements

Johnson next argues that because the police failed to read him the waiver portion of the *Miranda* warnings, his statement regarding the location of the handgun was made neither voluntarily nor knowingly. This court reviews de novo a trial court's determination that police did not obtain a confession in violation of *Miranda.*[34] While Johnson testified that he was not read his rights until after questioning, police testimony indicated Detective Edmondson read his rights immediately after the police entered the apartment. Detective Gordon read them again when he brought Washington into the room. The trial court concluded that both Detective Edmondson and Detective Gordon orally advised Johnson of his rights upon arrest and that Johnson acknowledged the advisement. The trial court's finding is supported by substantial evidence, and we defer to its evaluation of witness credibility. The issue, then, is whether Detective Edmondson's failure to read Johnson the waiver portion of the *Miranda* warning violated his constitutional rights and should have caused

---

[33]Also relevant is the fact that Johnson was *led* into the living room by the police officers. While this fact does not technically alter the above analysis, it is worth noting that if the officers had decided to sit Johnson down in the kitchen instead of the living room, under *Sabala* and *Taylor* this issue would never have been before a jury. Johnson had several opportunities to access his weapon, most notably when he was in the living room immediately before the police entered his apartment, but he never made a move to do so.

[34]*State v. Mendez*, 88 Wn. App. 785, 789-90, 947 P.2d 256 (1997).

the handgun evidence to be suppressed. As previously noted, Johnson acknowledged that he understood his rights, and then volunteered that Washington "didn't have anything to do with it." In *State v. Gross*, this court considered the same issue. When the police read the defendant his *Miranda* warnings, but did not ask him if he wished to waive his rights, the court held that the defendant's assertion that he understood his rights, followed by his volunteering information, reflected a knowing and intelligent waiver.[35] We reach the same conclusion here.

### 4. Evidence of Currency

 ██ Finally, Johnson contends that the trial court erred in admitting evidence of the large sum of money found in a safe in his apartment to support the inference that he intended to deliver drugs. A trial court's decision to admit evidence is reviewed for abuse of discretion.[36] The court said it admitted this evidence because "large volumes of money tends [sic] to show an intent to deliver." The court was correct that the crime of possession with intent to deliver is usually proved with circumstantial evidence.[37] And Washington courts consistently hold that possession of a large amount of cash is circumstantial evidence of intent to deliver.[38] Thus, the trial court's decision was consistent with Washington law.[39]

Because we conclude that the trial court erred in allowing the deadly weapon allegation to go to the jury but other-

---

[35]23 Wn. App. 319, 324, 597 P.2d 894, *review denied*, 92 Wn.2d 1033 (1979).

[36]*State v. Lynch*, 58 Wn. App. 83, 87, 792 P.2d 167, *review denied*, 115 Wn.2d 1020 (1990).

[37]*State v. Davis*, 79 Wn. App. 591, 594, 904 P.2d 306 (1995).

[38]*State v. Lane*, 56 Wn. App. 286, 297, 786 P.2d 277 (1989); *State v. Cobelli*, 56 Wn. App. 921, 924, 788 P.2d 1081 (1989).

[39]Johnson also argues that there was insufficient evidence to support the trial court's instruction to the jury that it could find Johnson an accomplice to this crime. If a defendant "exercised dominion or control over either the drugs or the area in which they were found" he or she can be liable as an accomplice. *State v. Spruell*, 57 Wn. App. 383, 388, 788 P.2d 21 (1990) (citing *State v. Mathews*, 4 Wn. App. 653, 656, 484 P.2d 942 (1971)). Because Johnson had dominion and control over his own apartment, the jury instruction was appropriate.

wise did not err, we reverse the sentence enhancement and affirm the VUCSA convictions.

APPELWICK, J., and SCHINDLER, J. Pro Tem., concur.