# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51096-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| NICHOL MARIE BLACKWELL, | |
| Appellant. | |

GLASGOW, J. — Police executed a search warrant on Nichol Marie Blackwell's property and in a safe, they found drugs and a single-shot Colt .22 Derringer pistol. They also found drugs and drug paraphernalia in other locations on the property.

The State charged Blackwell with unlawful possession of a controlled substance with intent to deliver, including a firearm enhancement and a school bus stop enhancement, and first degree unlawful possession of a firearm.[1] A jury convicted Blackwell on both charges. She now appeals her conviction and sentence for first degree unlawful possession of a firearm. She also appeals the firearm sentencing enhancement attached to her conviction for unlawful possession of a controlled substance with intent to deliver.

Blackwell argues that the trial court violated her due process rights when it denied her motion to exclude firearm operability evidence that the State disclosed only a few days before trial. She also argues the State failed to prove she was armed with a firearm for purposes of the

---

[1] Blackwell was also convicted of unlawful use of a building for drug purposes and bail jumping, but she does not appeal those convictions.

firearm enhancement. Finally, Blackwell argues the $200 criminal filing fee and the $100 DNA collection fee that the trial court imposed upon sentencing should be stricken in light of new law.

We affirm the trial court's decision to admit the firearm operability evidence and as a result, we uphold Blackwell's conviction for first degree unlawful possession of a firearm. We reverse the firearm enhancement because it was not supported by sufficient evidence that Blackwell was "armed." The firearm was locked in a safe, there was no ammunition on the property, and there was no evidence it was used or available for use in connection with the charged crimes.

We remand for the trial court to vacate the firearm enhancement and resentence Blackwell accordingly. On remand, the trial court must also reconsider the criminal filing fee, the DNA collection fee, and any accrued interest related to the imposition of these fees, in light of the new law and the State's concession.

FACTS

The police became aware of Blackwell through an informant who bought methamphetamine from her while under police surveillance. The police obtained and executed a search warrant on Blackwell's property. Her property had three homes: one modular home that served as the main residence and two trailers. It also had a shed. Blackwell was in the main residence when the police arrived and two people were in the trailers. Deputy Jesse Lee Hotz handcuffed Blackwell, placed her under arrest, and brought her outside. Once the police secured all the people on Blackwell's property, they began their search.

Detective Elizabeth Reigle searched Blackwell's person and found two sets of keys, one set of barrel keys and another set of bank bag keys. When asked what the keys opened,

Blackwell told Reigle that one barrel key opened a toolbox. She also said that she had found the bank bag keys that morning while cleaning the main residence.

In a lockbox in the shed, Detective Shaun Darby found drug-related paraphernalia. The lockbox also contained a plastic cup with methamphetamine residue, a glass smoking pipe with residue, plastic baggies commonly used to package drugs, and a working gram scale. Darby also found another lockbox that contained more plastic baggies, a measuring spoon and digital scale, and a number of glass smoking pipes with residue.

Hotz searched one of the trailers. He found mail addressed to Blackwell, including utility bills, and a working digital scale. Hotz also found a locked safe. Detective Robert Shaw pried the safe open, but later found a keyhole. A barrel key found on Blackwell worked to open the safe.

Inside the safe, the police found two locked bank bags that contained about 170 grams of methamphetamine, prescription medication in Blackwell's deceased father's name, a title to a truck in Blackwell's name, and a firearm. Shaw found the firearm in a case marked with a Colt symbol. The firearm was a single-shot Colt .22 "Derringer type pistol." Clerk's Papers (CP) at 90. Shaw opened the bank bags with the other set of keys found on Blackwell. Inside the first bank bag he found $3,821 and in the second was $1,883.

The State originally charged Blackwell with unlawful possession of a controlled substance with intent to deliver, which included a firearm enhancement, unlawful possession of a controlled substance, and second degree unlawful possession of a firearm.

The State provided Blackwell with its original witness list on January 24, 2017. It then provided supplemental witness lists on February 28, June 1, and June 14. The State maintained

3

it had disclosed all discovery and all trial witnesses at the trial readiness conference on July 21.

The readiness conference sheet dated in July 2017 contained a checked box for expert witnesses

and listed "firearm[s]" expert, but it did not provide the name of the expert.

On August 18, a scheduling order indicated trial would begin on September 27. A

witness list filed on August 29 did not list a firearms expert. On September 26, the day before

the scheduled beginning of trial, the State disclosed Investigator Adam Anderson's reports about

firearm operability to the defense for the first time. Anderson had tested the Colt .22 found in

Blackwell's safe and it worked. He also opined that a bullet fired from the gun could kill a

person. The State disclosed Anderson as an expert witness on a supplemental witness list for the

first time on September 28.

On September 28, Blackwell's defense counsel objected to the State's late disclosure of

evidence related to Anderson's firearm operability testing, arguing that the State had violated

discovery rules. The trial court denied the defense's motion to exclude without prejudice, noting

that counsel had until October 4 "to do whatever you think is necessary to respond to the

reports." *See* 2 Verbatim Report of Proceedings (VRP) at 78.

On October 4, counsel renewed the motion to exclude the firearm evidence and also

made a motion to dismiss. The omnibus order had required the State to disclose all trial

witnesses no later than two weeks prior to trial. The State admitted it did not have an

explanation for the late disclosure, but argued Blackwell did not suffer any prejudice. The trial

court agreed with defense counsel that the State violated discovery rules in CrR 4.7. It also

concluded that the late disclosure prejudiced Blackwell's ability to prepare an effective defense,

especially Anderson's cross-examination.

4

Even so, the trial court noted that dismissal under CrR 8.3 was an "extreme remedy and it is only to be exercised as a last resort." 4 VRP at 119. The trial court considered whether alternative remedies would cure any prejudice that Blackwell suffered from the nondisclosure. Rather than order a continuance or exclude the firearm evidence as defense counsel argued, the trial court required the State to call Anderson as the last witness and ordered the prosecutor to assist defense counsel in interviewing him before he testified. The trial court therefore denied Blackwell's motions to exclude or dismiss. The record is silent as to whether defense counsel interviewed Anderson before he testified.

At trial, Shaw testified that the firearm appeared to be a collector's item. Blackwell testified that the firearm belonged to her father who had recently passed away. On October 9, twelve calendar days after defense counsel received notice regarding the State's expert, Anderson testified. He testified that he tested the firearm and it worked without malfunction and that he believed the firearm could "possibly" kill someone. 5 VRP at 342-43. Anderson had tested the firearm using ammunition the crime lab provided. The State stipulated that there was no ammunition recovered from the scene. The State did not offer Anderson's firearm operability reports into evidence. Defense counsel cross-examined Anderson.

There was no evidence presented to the jury suggesting where Blackwell allegedly sold drugs. The State did not establish that she sold drugs from her property where the police found the gun, nor did it establish that she took the gun with her to protect herself or the drugs during off site transactions.

The State filed an amended information just before closing arguments. The State amended the charges against Blackwell to unlawful possession of a controlled substance with

intent to deliver, including both a firearm and a school bus route stop enhancement, first degree unlawful possession of a firearm, unlawful use of a building for drug purposes, and bail jumping.

The jury found Blackwell guilty as charged. The jury also found that Blackwell satisfied the requirements of the firearm and school bus stop enhancements. The trial court sentenced Blackwell to 120 months of total confinement, which included 36 months of flat time for the firearm enhancement. The trial court imposed a $500 crime victim assessment, a $100 DNA fee, and a $200 criminal filing fee. The court also found Blackwell to be indigent.

Blackwell appeals.

## ANALYSIS

### I. DENIAL OF MOTION TO EXCLUDE EVIDENCE

Blackwell argues that the trial court abused its discretion when it denied her motion to exclude evidence related to firearm operability, given the State's late disclosure. We agree that the State violated the criminal rules governing discovery but Blackwell is not entitled to a new trial.

The State's failure to timely disclose firearm reports and list Anderson as an expert witness violated CrR 4.7. Under CrR 4.7(a)(1)(i), the State must disclose the names of persons whom the prosecuting attorney intends to call as witnesses no later than the omnibus hearing. CrR 4.7(a)(2)(ii) also requires the State to disclose "any expert witnesses whom the prosecuting attorney will call at the hearing or trial, the subject of their testimony, and any reports they have submitted to the prosecuting attorney" no later than the omnibus hearing.

The State had the reports about firearm operability in March 2017, but did not disclose that material information or list Anderson as an expert witness until September 28, six calendar

6

days before trial began on October 4. The omnibus order required the State to disclose all trial witnesses no later than two weeks prior to trial. Because the State did not timely disclose to Blackwell the firearm reports, and because it did not timely disclose Anderson as an expert witness, we agree with the trial court's conclusion and the State's concession that the State violated its obligations under CrR 4.7.

Blackwell contends that the trial court abused its discretion when it denied her motion to exclude Anderson's testimony as a remedy for the discovery violation, thus depriving her of due process and a fair trial.

Initially, we note that there is a difference between the due process right to discovery and the discovery required under court rules. A criminal defendant's constitutional due process right to discovery extends only to exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State v. Blackwell*, 120 Wn.2d 822, 828, 845 P.2d 1017 (1993). The duty of the prosecutor under applicable court rules, however, is more extensive.

Generally, a trial court's discovery rulings under CrR 4.7 will not be disturbed absent a manifest abuse of discretion. *State v. Garcia-Salgado*, 170 Wn.2d 176, 183, 240 P.3d 153 (2010). A trial court abuses its discretion when its "decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

"The purpose of the discovery rules . . . is to prevent a defendant from being prejudiced by surprise, misconduct, or arbitrary action by the government." *State v. Cannon*, 130 Wn.2d 313, 328, 922 P.2d 1293 (1996). As a remedy for the State's failure to comply with a discovery rule, the trial court may order disclosure of material and information not previously disclosed,

grant a continuance, dismiss the action, or enter other orders it deems just under the circumstances. CrR 4.7(h)(7)(i). "Exclusion or suppression of evidence is an extraordinary remedy and should be applied narrowly." *State v. Hutchinson*, 135 Wn.2d 863, 882, 959 P.2d 1061 (1998). In deciding whether to exclude evidence as a sanction, the trial court considers (1) the effectiveness of less severe sanctions, (2) the impact of witness preclusion on the evidence at trial and the outcome of the case, (3) the extent to which the witness's testimony will surprise or prejudice the other party, and (4) whether the violation was willful or in bad faith. *Id.* at 882-83; *see also State v. Venegas*, 155 Wn. App. 507, 521-23, 228 P.3d 813 (2010).

In considering Blackwell's motion to exclude evidence as a sanction, the trial court appears to have placed significant weight on the first *Hutchinson* factor—the effectiveness of less severe sanctions. In *Hutchinson*, 135 Wn.2d at 881, our Supreme Court stated that a party's failure to identify witnesses in a timely manner may be "appropriately remedied" by continuing trial to give the nonviolating party time to interview the new witness. Rather than exclude Anderson's testimony or order a continuance, though, the trial court required the State to call Anderson as the last witness and ordered the prosecutor to assist defense counsel in interviewing him before he testified.

Blackwell did not argue for a continuance and the trial court exercised its sound discretion to delay Anderson's testimony as long as possible to allow the defendant to interview Anderson. The trial court did not abuse its discretion when it concluded that this remedy would have cured any prejudice. Even if the defense wanted to present its own expert, it could have explored that possibility and then asked for a continuance or other remedy if necessary.

The other three *Hutchinson* factors do not weigh heavily in favor of the "extraordinary remedy" of exclusion. While the late disclosure of the identity of the expert witness surprised Blackwell, she had been alerted in July 2017 that there would be testimony from a firearms expert. And the fact that firearm operability would likely be an issue at trial should not have been a surprise. Defense counsel had notice that the State would be presenting evidence regarding the firearm enhancement and unlawful possession of a firearm as early as June 2016, when the State filed its information. While firearm operability is not an element of either the firearm enhancement or firearm possession statutes, *see* RCW 9.94A.533(3), and RCW 9.41.040(1)(a), both statutes incorporate by reference the definition of the "firearm" provided in RCW 9.41.010(11).

"'Firearm' means a weapon or device from which a projectile or projectiles *may be fired* by an explosive such as gunpowder." RCW 9.41.010(11) (emphasis added). Defense counsel had adequate notice that the State would be required to prove the firearm *may be fired* in order to convict Blackwell of the crimes charged. Therefore, Blackwell could have anticipated that the State would be offering some kind of evidence concerning whether or not the firearm was functional.

The fact that the State had to prove that the firearm could be fired also implicates the second factor of the *Hutchinson* test, the impact of witness preclusion on the evidence at trial and the outcome of the case. 135 Wn.2d at 882-83. Excluding Anderson's testimony would have deprived the jury of the proof that the Colt .22 met the definition of "firearm."

Finally, there is no evidence the State's discovery violation occurred willfully or in bad faith; instead, the late disclosure appeared to be an oversight.

9

We hold that the trial court did not abuse its discretion when it gave the defense 12 days to interview Anderson and prepare for his cross examination, or to explore the possibility of having its own expert test the firearm, but denied Blackwell's motion to exclude evidence related to firearm operability. And because the evidence was not exculpatory, its late disclosure did not implicate due process. *Blackwell*, 120 Wn.2d at 828.

## II. INSUFFICIENT EVIDENCE TO SUPPORT THE FIREARM SENTENCING ENHANCEMENT

Blackwell argues that the State presented insufficient evidence to prove that she was armed with a firearm for purposes of the firearm enhancement. We agree.

Whether a person is armed for the purposes of the firearm enhancement is a mixed question of law and fact that we review de novo. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 825, 425 P.3d 807 (2018). "As long as any rational trier of fact could have found that he was armed, viewing the evidence in the light most favorable to the State, sufficient evidence exists." *State v. Eckenrode*, 159 Wn.2d 488, 494, 150 P.3d 1116 (2007). We view the evidence in the light most favorable to the State and draw all inferences in the State's favor. *Id.* Circumstantial evidence and direct evidence are equally reliable. *State v. O'Neal*, 159 Wn.2d 500, 506, 150 P.3d 1121 (2007). We defer to the fact finder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

RCW 9.94A.533(3) provides, in part: "[A]dditional times shall be added to the standard sentence range for felony crimes . . . if the offender . . . was *armed with a firearm*." (Emphasis added.) RCW 9.41.010(11), in turn, defines "firearm" as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010 does

10

not define the term "armed," but Washington courts have addressed what factual circumstances can support a finding that a defendant was armed.

Our Supreme Court has held that to prove a defendant was "armed" for purposes of the firearm enhancement, "the State must prove (1) that a firearm was easily accessible and readily available for offensive or defensive purposes during the commission of the crime and (2) that a nexus exists among the defendant, the weapon, and the crime." *Sassen Van Elsloo*, 191 Wn.2d at 826; *see also State v. Easterlin*, 159 Wn.2d 203, 206, 149 P.3d 366 (2006) (adopting two-part test).

Consistent with these requirements, the court instructed the jury that "[a] person is armed with a firearm if, at the time of the commission of the crime, the firearm is easily accessible and readily available for offensive of defensive purposes." CP at 56. The instruction also required that "[t]he State must prove beyond a reasonable doubt that there was a connection between the firearm and the defendant. The State must also prove beyond a reasonable doubt that there was a connection between the firearm and the crime." CP at 56. Finally, the instruction directed the jury to consider, "among other factors, the nature of the crime and the circumstances surrounding the commission of the crime, including the location of the firearm at the time of the crime, and whether the firearm was used." CP at 56.

To be "easily accessible and readily available," "[t]he presence, close proximity, or constructive possession of a firearm at the scene of a crime, by itself, is insufficient." *Sassen Van Elsloo*, 191 Wn.2d at 826. But

> [a] defendant "does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement," and the State "need not establish with mathematical precision the specific time and place that a weapon was readily available and easily accessible, so long as it was at the time of the crime."

11

*Sassen Van Elsloo*, 191 Wn.2d at 826-27 (quoting *O'Neal*, 159 Wn.2d at 504-05). "The use may be for either offensive *or* defensive purposes, whether to facilitate the commission of the crime, escape from the scene of the crime, protect contraband or the like, or prevent investigation, discovery, or apprehension by the police." *Gurske*, 155 Wn.2d at 139. In a drug possession case, for example, a firearm could be used to acquire or protect drugs. *Id.* It also could be used to inhibit the police from investigation or apprehension at the time they discover the drugs or seek to execute a warrant. *Id*.

In addition, for a firearm enhancement to apply, there must be a nexus between "'the nature of the crime, the type of weapon, and the circumstances under which the weapon is found.'" *State v. Brown*, 162 Wn.2d 422, 431, 173 P.3d 245 (2007) (quoting *State v. Schelin*, 147 Wn.2d 562, 570, 55 P.3d 632 (2002) (plurality opinion)). The nexus requirement "'serves to place parameters on the determination of when a defendant is armed, especially in the instance of an ongoing crime such as constructive possession of drugs.'" *Sassen Van Elsloo*, 191 Wn.2d at 827 (quoting *Gurske*, 155 Wn.2d at 140). Without this nexus, there is a risk that a defendant will be punished for lawful ownership or possession of a firearm. *See id*.

To determine whether a nexus exists, we analyze the nature of the crime, the type of firearm, and the circumstances under which it was found. *Sassen Van Elsloo*, 191 Wn.2d at 827. But when the crime is of a continuing nature, such as a drug operation, a nexus exists if the firearm is "'there to be used'" in the commission of the crime. *Id*. at 828 (quoting *Gurske*, 155 Wn.2d at 138).

Blackwell and the State both compare these facts with a number of cases. In *Gurske*, 155 Wn.2d at 137-44, *State v. Valdobinos*, 122 Wn.2d 270, 281-82, 858 P.2d 199 (1993), *State v.*

*Johnson*, 94 Wn. App. 882, 89-97, 974 P.2d 855 (1999), and *State v. Mills*, 80 Wn. App. 231, 234-37, 907 P.2d 316 (1995), the courts concluded that the evidence was insufficient to support a finding that the defendant was "armed."

In *Gurske*, the police found a zipped-up backpack on the back seat of the defendant's truck that contained an unloaded pistol, a loaded magazine, and drugs. 155 Wn.2d at 143. Our Supreme Court determined that the firearm in that case was not easily accessible and readily available at the time of the crime. *Id.* at 143-44. The backpack containing the firearm was zipped and the defendant could not remove the firearm for offensive or defensive purposes unless he exited the truck. *Id.* The court acknowledged that because "armed" criminals pose a threat to public safety, and firearms can turn any crime into one involving serious injury or death, the "deadly weapon statute is directed at more than the protection of the police." *Id.* at 139. "[T]he legislature also intended to deter armed crime and to protect victims from armed crime." *Id.* However, the court noted that "[t]he accessibility and availability requirement also means that the weapon must be easy to get to for *use* against another person, whether a victim, a drug dealer (for example), or the police." *Id.*

Although there was physical proximity of the firearm, the methamphetamine, and the defendant, there was no evidence in the record giving rise to the inference that the defendant could reach the firearm from his position in the vehicle. *Id.* at 143. Moreover, there was no evidence that the defendant had used or had easy access to use the firearm against another person at any other time, that is, when he acquired or was in possession of the methamphetamine. *Id.*

In *Valdobinos*, the police found cocaine, evidence of delivery, and an unloaded rifle under a bed in the defendant's home. 122 Wn.2d at 273-74, 282. However, there was no

evidence that the firearm had any connection to the crime. *Id.* at 282. Our Supreme Court vacated the firearms enhancement because the State did not show that the weapon was "accessible and readily available for offensive or defensive purposes." *Id.*

In *Johnson*, while executing a search warrant an officer saw the defendant running from the living room toward the bathroom. 94 Wn. App. at 887. The officers handcuffed the defendant and seated him between the living room and the dining room. *Id.* at 888. The officers asked Johnson if there were any weapons in the house. *Id.* Johnson advised there was a firearm in a coffee table drawer, which was about five to six feet away from where he was sitting. *Id.* Division One of this court reversed the firearm enhancement, reasoning that there was no realistic possibility that the defendant could access the firearm while sitting handcuffed five to six feet away. *Id.* at 894-95. The court concluded that the mere presence of a firearm at a crime scene may be insufficient to establish the nexus between a crime and a weapon, even in circumstances involving ongoing crimes such as a drug operation. *Id.* (rejecting this court's reasoning in *State v. Simonson*, 91 Wn. App. 874, 881, 883, 960 P.2d 955 (1998)). Where the only people endangered by a defendant's firearm possession are arresting officers, it follows that if a defendant is not near his firearm when an officer conducts the arrest, the purposes of the sentencing enhancement are not implicated. *Id.* at 896.

In *Mills*, after finding methamphetamine in the defendant's car, an officer arrested him and placed him in the back of a patrol car. 80 Wn. App. at 233. The defendant acted suspiciously while in the patrol car, prompting the officer to search the back seat, where he discovered a motel key. *Id.* The police then searched the motel room and found more methamphetamine and a firearm in a pouch beside the drugs. *Id.* While we found a nexus

14

between the firearm and the drugs, we concluded the required nexus between the defendant and the firearm was not present—there was no physical proximity to the firearm at a time when availability for use for offensive or defensive purposes was critical. *Id*. at 236-37.

In contrast, in *Sassen Van Elsloo*, 191 Wn.2d at 824-31, *State v. Neff*, 163 Wn.2d 453, 461-65, 181 P.3d 819 (2008) (plurality opinion), *O'Neal*, 159 Wn.2d at 503-07, *Eckenrode*, 159 Wn.2d at 492-96 (plurality opinion), and *Schelin*, 147 Wn.2d at 573-76 (plurality opinion), our Supreme Court concluded that sufficient evidence supported the jury's finding that the defendant was armed.

In *Sassen Van Elsloo*, an officer attempted to pull the vehicle over for a traffic violation, and a chase ensued. 191 Wn.2d at 802. When the officer caught up with the vehicle, the driver had run away on foot, but a passenger remained and identified the driver. *Id*. The officer noticed the handle of a shotgun, impounded the vehicle, and obtained a search warrant. *Id*. Police found a loaded shotgun, a backpack containing drugs and drug paraphernalia, and a locked bank bag containing drugs in the cargo hold. *Id.* at 802-03. Police also found a locked safe in the back of the car containing two additional firearms and cash. *Id*. at 830. The backpack in the car contained several receipts with the defendant's name and his DNA was found on the shotgun. *Id.* A witness testified that the defendant had been driving on the date of the incident, that the safe belonged to the defendant, and that he took it wherever he went. *Id*.

The court noted that unlike the other firearms found in the locked safe, the shotgun that was the basis of the firearm enhancement was readily available and easily accessible for offensive or defensive purposes to protect the defendant's drug operation. *Id*. Critically, the shotgun was found less than a foot from the backpack, which contained the drugs that were the

15

sole source of the drug charges. *Id*. Thus, the court held there was sufficient evidence to conclude that the shotgun in the car was easily accessible and readily available during the commission of the drug crimes and that nexus existed among the defendant, the gun, and the crime. *Id*. at 829-31.

In *Neff*, 163 Wn.2d at 465,[2] a plurality of our Supreme Court recognized that there was sufficient evidence to support a firearm enhancement where the defendant was manufacturing methamphetamine in his garage and the police found three loaded pistols nearby. The plurality emphasized that the defendant does not have to be armed at the moment of arrest to be armed for purposes of the enhancement. *Id*. at 464. Moreover, the fact finder in *Neff* was entitled to infer from surveillance equipment that Neff was preparing to defend his drug operation, and the guns were connected to the crime because they too were used to protect the operation. *Id.* at 464-65. The plurality also relied on the fact that drug manufacturing was an ongoing crime. *Id.* at 465. Sufficient evidence supported the finding that Neff had manufactured drugs in the past with guns at hand and surveillance cameras watching for approaching cars. *Id*.

Similarly, in *O'Neal*, the police received a tip regarding the site of methamphetamine manufacture. 159 Wn.2d at 502. When executing a search warrant, officers found considerable evidence of drug use and manufacturing. *Id*. at 502-03. Police seized more than 20 firearms and other paraphernalia including weapons from two gun safes, one locked and one unlocked. *Id*. at 503. A loaded AR-15 rifle was found in one bedroom, and a loaded semiautomatic pistol was found under a mattress in a different bedroom. *Id*. at 503. The court reiterated that "[t]he

---

[2] Four justices agreed with the plurality's result but also believed that Neff had waived his right to appeal. *Neff*, 163 Wn.2d at 466, 471 (Bridge, J., concurring).

defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement." *Id*. at 504. There was testimony that indicated one defendant slept with the gun under his mattress for protection. *Id*. at 502. There was also evidence that one person often stood guard over the operation, indicating that the defendants intended to protect it. *Id*. at 506. The evidence supported the State's theory that the AR-15 leaning against a wall and the pistol under a mattress were easily accessible and readily available to protect the continuing drug production operation. *Id*. There was also a sufficient nexus among the firearm, the defendants, and the crime for a jury to find the defendants were armed. *Id*.

In *Eckenrode*, our Supreme Court found sufficient evidence to uphold the jury's conclusion that the firearms were easily accessible and readily available because the defendant himself told the 911 operator that he had a loaded firearm in his hand and that he was prepared to shoot an intruder. 159 Wn.2d at 494 (plurality opinion). In addition, the defendant had a police scanner, suggesting that he was preparing to protect his criminal enterprise. *Id*. Although *Eckenrode* is a plurality opinion, all of the justices agreed on the sufficiency of the evidence analysis. 159 Wn.2d at 497-98 (Alexander, C.J., concurring); 159 Wn.2d at 498-99 (Madsen, J., concurring); 159 Wn.2d at 499 (Johnson, J.M., J., concurring)

In *Schelin*, after the police entered the defendant's home pursuant to a warrant, they found him in the basement at the bottom of the stairs. 147 Wn.2d at 564 (plurality opinion). The basement contained two rooms and a laundry room. *Id*. In one room, the police found marijuana plants; in the other room, the police found harvested marijuana and related items. *Id*. The police also found a loaded firearm in a holster hanging from a nail on a wall about six to ten feet away from where the defendant had been standing. *Id*. Our Supreme Court held that the firearm was

easily accessible and readily available for use against the police in an escape attempt, to protect the contraband, or to prevent apprehension for possession of the marijuana. *Id.* at 573-75. The court concluded that the jury could draw an inference that the firearm was connected to the grow operation even though Schelin provided another explanation for needing the gun, namely fear that his girlfriend's ex-husband might try to harm them. *Id.* Although *Schelin* is another plurality opinion, the concurrence agreed on sufficiency of the evidence analysis. *Schelin,* 147 Wn.2d at 576-77 (Alexander, C.J., concurring).

This case is more like *Gurske*, *Valdobinos*, *Johnson*, and *Mills* than *Sassen Van Elsloo*, *Neff*, *O'Neal*, *Eckenrode*, or *Schelin*.

Here, the police entered Blackwell's home pursuant to a search warrant and found various items of paraphernalia normally associated with drug dealing and a key to a safe in Blackwell's possession. The police located the safe, not in the house where Blackwell was, but in a separate trailer on Blackwell's property. Inside the safe, the police found about 170 grams of methamphetamine, prescription medication in Blackwell's deceased father's name, a title to a truck in Blackwell's name, two locked bank bags containing cash, and a firearm. The single shot firearm was in a case. There was no evidence that the firearm was loaded or that there was any ammunition nearby, or even on the property. Blackwell testified the gun belonged to her father who had recently passed away. An officer testified the firearm appeared to be a collector's item.

The firearm in question was not easily accessible and readily available for offensive or defensive purposes. "The presence, close proximity, or constructive possession of a weapon at the scene of a crime is, by itself, insufficient to show that the defendant was armed for the purpose of a firearm enhancement." *Sassen Van Elsloo*, 191 Wn.2d at 826. In *Valdobinos* and

18

*Johnson*, the courts found the defendants were not armed even though their respective firearms were under the bed and in a drawer either in the next room or within a few feet; ostensibly, they could have taken just a few steps and grabbed their firearms. *See Mills*, 80 Wn. App. at 236-37. Here, Blackwell would have had to exit the house, walk to the trailer, unlock the safe, and remove the firearm from the gun case in order to use it; it could fire only one round; and there was no evidence that Blackwell possessed any ammunition or that the gun was loaded.

Significantly, firearms locked in safes have not typically been deemed readily available and easily accessible for offensive or defensive purposes. *See, e.g.*, *Sassen Van Elsloo*, 191 Wn.2d at 830 (firearms locked in a safe were not the basis of the sentencing enhancement); *O'Neal*, 159 Wn.2d at 503 (same); *State v. Ague-Masters*, 138 Wn. App. 86, 104-05, 156 P.3d 265 (2007) (concluding there was insufficient evidence to support a firearm enhancement where 12 unloaded firearms were locked in a safe that was 100 feet away from methamphetamine lab in a shed on the property); *but see Neff*, 163 Wn.2d at 464-65 (concluding there was sufficient evidence to support a firearm enhancement where two guns were locked in a safe but a third was not).

In closing arguments, the State asserted that "[t]his firearm was easily accessible and readily available to the defendant. . . .  Any time that the defendant accessed the large amount of methamphetamine that she had, she also had access to the firearm.  Any time that she was within arm's reach of that cash, she was [with]in arm's reach of a firearm."  6 VRP at 411.  The State likewise argues on appeal that Blackwell "stored her weapon with her stash of methamphetamine and cash so it would be readily available whenever she sold the drugs."  Br. of Resp't at 22-23. But there is no evidence in the record to establish that she was selling drugs from her property

19

where the safe was located or that she carried the firearm with her to another location to make sales. Thus, there was no evidence that when Blackwell sold drugs, the firearm was available for use against another person. Moreover, the firearm, locked in the safe, was not available to prevent investigation, discovery, or apprehension by the police. *See Gurske*, 155 Wn.2d at 138-39, 143. While firearms always pose a potential danger, Blackwell could not have readily or easily accessed the firearm at the time the police executed the search warrant, and even if she could have, there was no ammunition on the property. *See Mills*, 80 Wn. App. at 236-37. In sum, although Blackwell possessed the keys to the safe, there was no physical proximity to the firearm at a time when availability for use for offensive or defensive purposes was critical. *See Mills*, 80 Wn. App. at 236-37.

*Sassen Van Elsloo*, *Neff*, *O'Neal*, *Eckenrode*, or *Schelin* are distinguishable. In *Sassen Van Elsloo*, the court did not conclude the firearms locked in the safe provided a basis for the firearms enhancement; rather, it concluded that the loaded shotgun, which was found in close proximity to the drugs, ammunition, and other paraphernalia, was readily available and easily accessible to protect the drug operation the defendant conducted out of his vehicle. 191 Wn.2d at 829-31. Although two of the firearms in *Neff* were similarly locked in a safe, one was not. 163 Wn.2d at 457. In addition, the *Neff* court concluded that the existence of counter-surveillance cameras watching for police or intruders allowed the jury to make a reasonable inference that the defendant used the firearms to protect his drug operation. 163 Wn.2d at 465.

In *O'Neal*, a witness testified that he had been helping the defendants manufacture drugs for several months and there was evidence that the defendants had stood watch during critical

points during the methamphetamine production. 159 Wn.2d at 506. The court concluded a jury could infer from this testimony that there were guns readily available and easily accessible to one or more of the accomplices to protect the drug manufacturing operation. *Id*. Moreover, in *Eckenrode*, the defendant told the 911 operator that he had a gun and was willing to use it; he also had a police scanner, which together with his manufacturing operation raised the inference that he was monitoring police activity against the chance he might be raided. 159 Wn.2d at 494.

Finally, in *Schelin*, the defendant was standing no more than 10 feet from the firearm when the police found him in a basement that contained 120 marijuana plants. 147 Wn.2d at 564. It is true that in *Schelin*, the court allowed the jury to infer the intent to use the gun to protect the grow operation despite the defendant's testimony regarding another reason for the gun. *Id*. at 574. Nevertheless, the nature of the firearm in this case, a single shot .22 with no ammunition anywhere on the property, makes it far less legitimate to allow an inference where Blackwell's father had recently died and the gun had been his.

Given the nature of the firearm and the fact that it was stored in a safe, as well as the absence of proof that Blackwell used the firearm in the course of her crimes, no reasonable trier of fact could have found the facts sufficient to prove that the defendant was armed with a firearm. We reverse the firearm sentencing enhancement and remand for the trial court to vacate the enhancement and resentence Blackwell.

### III. LEGAL FINANCIAL OBLIGATIONS

Finally, Blackwell argues that the trial court erred when it ordered her to pay a criminal filing fee and a DNA collection fee. The State agrees.

The legislature amended former RCW 36.18.020(2)(h) to prohibit trial courts from imposing the criminal filing fee on defendants who are indigent at the time of sentencing. LAWS OF 2018, ch. 269, § 7. The legislature also amended former RCW 43.43.7541 to require imposition of the DNA collection fee "unless the state has previously collected the offender's DNA as a result of a prior conviction." LAWS OF 2018, ch. 269, § 18. In *State v. Ramirez*, 191 Wn.2d 732, 747-50, 426 P.3d 714 (2018), our Supreme Court held that these amendments apply prospectively to indigent defendants whose direct review is not yet final.

The trial court found Blackwell indigent upon sentencing. The State's records also show that Blackwell's DNA has been previously collected and is on file with the Washington State Patrol. The State concedes that both fees should be stricken. Upon remand, the trial court must reevaluate the filing fee, the DNA collection fee, and any accrued interest related to the imposition of these fees, in light of the new law and the State's concession.

## CONCLUSION

We affirm the trial court's decision to admit the firearm operability evidence and uphold Blackwell's conviction, but we reverse the firearm enhancement because it was not supported by sufficient evidence that Blackwell was armed. We remand for the trial court to vacate the firearm enhancement and resentence Blackwell accordingly. The trial court must also reconsider the criminal filing fee, the DNA collection fee, and any accrued interest related to the imposition

No. 51096-1-II

of these fees, in light of the new law and the State's concession.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, J._____
Glasgow, J.

We concur:

_Melnick, J._____
Melnick, P.J.

_Sutton, J._____
Sutton, J.