# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52401-5-II |
| Respondent, | |
| v. | |
| RICKY RAY SEXTON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—A confidential informant told police that Ricky Ray Sexton was selling methamphetamine out of his home. The police obtained a warrant to search the home for any evidence related to the sale of methamphetamine. As the police arrived to execute the warrant, a man on the porch of the home saw them and ran inside. The police then announced their presence and the fact that they had a warrant over a loudspeaker as they rushed to and breached the door. The police seized methamphetamine and other drugs, as well as a firearm and several items typically used for packaging methamphetamine for sale.

The trial court denied Sexton's motions to suppress the evidence from the search and to represent himself. After a jury trial, Sexton was convicted of possession of methamphetamine with intent to deliver, possession of methylphenidate with intent to deliver, possession of oxycodone, and unlawful possession of a firearm.

Sexton appeals, arguing that the evidence seized from his home should have been suppressed because the police violated the knock and announce rule and probable cause had become stale by the time they executed the search warrant. He argues that the trial court violated his right of self-representation and improperly commented on the evidence in the jury instructions.

Sexton also alleges errors related to the maximum sentence for his methylphenidate conviction and the imposition of a community custody condition. He claims that several legal financial obligations were improperly imposed. He also filed a statement of additional grounds (SAG) alleging ineffective assistance of counsel.

We affirm Sexton's convictions. The police's actions satisfied the knock and announce rule and were independently justified by exigent circumstances. Probable cause had not become stale. The trial court did not err in denying Sexton's motion to represent himself because his request was equivocal. The jury instructions on possession did not constitute a judicial comment on the evidence. None of the arguments in Sexton's SAG requires reversal.

We remand for the trial court to strike the improper legal financial obligations from Sexton's judgment and sentence, reexamine the imposition of the supervision assessment fee, correct the challenged community custody condition to prohibit Sexton from *knowingly* associating with drug users or sellers, and determine whether Sexton had a qualifying prior conviction under RCW 69.50.408(2) and resentence him if necessary.

FACTS

A confidential informant told the police that they had recently been to Sexton's home and witnessed him selling methamphetamine. The informant said that Sexton regularly sold methamphetamine out of his home. The informant also said that they saw varying amounts of methamphetamine in different sized baggies, other packaging of various sizes, a handgun, and a drug scale. Based on this information, police obtained a warrant to search Sexton's home for evidence of the crime of possession of a controlled substance with intent to deliver, including methamphetamine, firearms, and equipment and other items "of any kind which are used, or

intended for use, in the manufacturing, compounding, processing, delivering, packaging, importing or exporting of methamphetamine and/or any controlled substances." Clerk's Papers (CP) at 21. The warrant was issued within 72 hours of the informant being in Sexton's home.

The police conducted a threat assessment, identified this warrant as high risk, and assembled a special weapons and tactics team (SWAT) to execute the warrant. The threat assessment was based on information that Sexton was selling drugs at his home, he was known to carry a firearm, he had a large dog at his residence that could be used for counter surveillance, and it would be difficult for police to surprise the occupants when executing the warrant due to the home's location and local topography.

In the early morning, nine days after the police received the tip from the informant, a SWAT team went to Sexton's home to serve the warrant. As the SWAT armored vehicle approached Sexton's home, police officers observed a man on the front porch who saw them and then ran inside the home. An officer yelled out that the operation was compromised, and several officers rushed up to the home to breach the door. The officer tasked with breaching the door testified that he did not knock and announce his presence because "compromise" had been called, although another officer testified that he was continuously broadcasting over the vehicle's loudspeaker system identifying the officers as police, explaining that they had a warrant, and ordering the occupants of the home to get on the ground. 1 Verbatim Report of Proceedings (VRP) (Feb. 13-14, 2018) at 59, 91.

Once inside, the police seized digital scales, a spiral notebook with names and numbers, a handgun, bottles containing oxycodone and methylphenidate, and several bags containing methamphetamine. The officers arrested Sexton, and the State charged him with one count of

possession of methamphetamine with intent to deliver, one count of possession of methylphenidate with intent to deliver, one count of possession of oxycodone, and one count of unlawful possession of a firearm. The two counts of possession with intent to deliver also carried firearm enhancements.

Sexton moved to suppress evidence seized from the search of his home. At the hearing on the motion, police officers testified that in their experience methamphetamine is easily disposable and that suspects often try to dispose of drugs in similar circumstances. There was also testimony on the basis for classifying the warrant as high risk and the reasons for using a SWAT team to execute the warrant, as described above.

There was conflicting testimony about what message the police announced over the loudspeaker just before the officers breached the door, as well as the length of the delay between the beginning of those announcements and the breach. One officer testified that he announced over the loudspeaker, "[T]his is the police, we have a warrant, get on the ground," and that the other officers breached the door 10 to 15 seconds later. *Id.* at 91-92. Another officer testified that the announcement was, "[P]olice, search warrant, open the door," and the breach occurred three to five seconds later. *Id.* at 57, 64.

The trial court denied the motion to suppress. The court found that the basis for using a SWAT team was "information that the defendant may be dealing controlled substance out of his residence, was known to carry a firearm, had a large dog at his residence, and the difficulty of maintaining concealment while approaching the defendant's residence based upon its location and topography." CP at 121. The trial court found that each of the testifying officers was credible in their testimony. The court entered findings concerning the officers' conflicting testimony, finding that the officers informed the occupants of Sexton's home "of their presence, their identity, their

4

purpose for being there, and to demand admittance." CP at 126. The court found that about 15 seconds passed between the beginning of the announcements and the moment the police breached the door.

The trial court orally concluded that the officers' actions satisfactorily complied with the knock and announce rule. In its written conclusions, the court determined that the delay in time between the officers' announcements and the forced entry was reasonable and did not violate the law. The court also ruled that exigent circumstances justified the officers' "expedient entry" into Sexton's home, based on the fact that the officers "had been observed by a person at the defendant's residence resulting in 'compromise' being called out, that the search warrant was issued for evidence that could be easily and quickly destroyed, and that Deputies had been advised that the defendant was known to carry a firearm." CP at 126.

The trial court also ruled that the nine-day delay in executing the warrant had not rendered probable cause stale. The warrant was served within 10 days and the suspected criminal activity as described in the affidavit establishing probable cause was ongoing in nature. The court also reasoned that the fact that Sexton was operating out of a single-family home, as opposed to a car or boat, suggested that the operation was ongoing rather than merely transitory.

The following day, when jury selection was set to begin, Sexton fired his attorney and verbally asked to represent himself, without filing a formal motion. The trial court asked Sexton if he intended to represent himself and Sexton replied, "At this time, yes." 2 VRP (Feb. 15, 2018) at 7. When the court asked him to clarify, Sexton discussed at length his frustrations with the proceeding up to that point and the emotional turmoil he was going through, saying he was "reluctantly" firing his attorney. *Id.* at 8. He indicated that the reasons he wanted to fire his attorney

were personal disagreements, frustrations over numerous delays in the proceeding, the court's denial of his suppression motion, and the fact that he could no longer afford to pay the attorney. Sexton also informed the court that he had attempted to contact an attorney in Seattle that he indicated would assist him with his case. The court then engaged in a lengthy colloquy in which he asked about Sexton's knowledge of the legal system, discussed the risks of self-representation, and advised Sexton that he would be held to the same technical and procedural requirements as an attorney.

The trial court ultimately denied the motion, finding that Sexton's request was untimely and made for the purposes of delaying the proceedings, that Sexton's request was equivocal, and that Sexton was not prepared to try his own case.

At trial, police officers testified regarding the items seized from Sexton's home. The trial court issued substantively identical jury instructions on possession with respect to the firearm and the drugs. The jury instructions stated that possession can be actual or constructive, and constructive possession occurs when there is dominion or control over the item in question. The instructions continued:

> In deciding whether the defendant had dominion and control over [an item], you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the ability to take actual possession of the [item], whether the defendant had the capacity to exclude others from possession of the [item], and whether the defendant had dominion and control over the premises where the [item] was located. No single one of these factors necessarily controls your decision.

CP at 61, 76.

The jury found Sexton guilty on all counts but did not find that the firearm enhancements applied. The trial court sentenced Sexton to 85 months of confinement on each of the drug

6

possession counts and 24 months on the one count of firearm possession, all to be served concurrently. The court listed the maximum sentence for the methylphenidate conviction, a class C felony, as 10 years. Sexton's statement of criminal history and offender score identified the methylphenidate conviction as a class B felony.

During the sentencing hearing, the trial court stated that it would impose a condition of community custody forbidding Sexton from *knowingly* associating with drug users or sellers, as that is what the State requested. On Sexton's judgment and sentence, the court forbade him from associating with all drug users and sellers, leaving out the word "knowingly." CP at 112. The trial court also imposed a criminal filing fee, DNA collection fee, and community supervision fee.

Sexton appeals.

## ANALYSIS

### I. SEXTON'S RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES

Sexton argues the police violated his right to be free from unreasonable searches and seizures when they raided his home, and all evidence from that search should have been suppressed. First, he argues the police violated the knock and announce rule when they broke down his door without first asking for and being denied permission to enter. Second, he argues the police no longer had probable cause to search his home when they executed the search warrant. We reject both arguments.

### A.    Knock and Announce

Sexton argues that the police violated the knock and announce rule when they executed the search warrant because they did not knock on his door and announce their presence before breaking in. We disagree. The trial court did not err when it concluded that the police complied with the

knock and announce rule, but even if they had not complied, exigent circumstances supported immediate entry into Sexton's home.

      1.      <u>The knock and announce rule generally</u>

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution both require that the police comply with the knock and announce rule before entering a person's home without consent. *State v. Ortiz*, 196 Wn. App. 301, 307, 383 P.3d 586 (2016). Washington has codified this requirement in RCW 10.31.040: "To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his or her office and purpose, he or she be refused admittance." This statute applies to both arrest warrants and search warrants. *State v. Shelly*, 58 Wn. App. 908, 910, 795 P.2d 187 (1990).

"'To comply with the statute, the police must, prior to a nonconsensual entry, announce their identity, demand admittance, announce the purpose of their demand, and be explicitly or implicitly denied admittance.'" *Ortiz*, 196 Wn. App. at 307-08 (quoting *State v. Coyle*, 95 Wn.2d 1, 6, 621 P.2d 1256 (1980)). Denial of admittance may be inferred by lack of response. *Id.* at 308. The police must observe a reasonable "'waiting period'" before they may enter without permission. *Id.* (quoting *State v. Richards*, 136 Wn.2d 361, 370, 962 P.2d 118 (1998)).

"'Whether an officer waited a reasonable time before entering a residence is a factual determination to be made by the trial court and depends upon the circumstances of the case.'" *Id.* at 308 (quoting *Richards*, 136 Wn.2d at 374). The trial court evaluates the reasonableness of the waiting period by considering the purposes of the rule: "'(1) [R]eduction of potential violence to both occupants and police arising from an unannounced entry, (2) prevention of unnecessary

property damage, and (3) protection of an occupant's right to privacy.'" *Id.* (quoting *Coyle*, 95 Wn.2d at 5).

Courts require strict compliance with the rule unless the police can show the existence of exigent circumstances or that compliance with the rule was futile because police presence was likely known. *Id.*; *Coyle*, 95 Wn.2d at 11-12. Exigent circumstances may exist where "the police had 'a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.'" *State v. Cardenas*, 146 Wn.2d 400, 411, 47 P.3d 127 (2002) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997)). "To prove exigent circumstances, the State must 'point to specific, articulable facts and the reasonable inferences therefrom which justify the intrusion.'" *State v. Muhammad*, 194 Wn.2d 577, 597, 451 P.3d 1060 (2019) (quoting *Coyle*, 95 Wn.2d at 9).

The State can make this showing either with evidence that police received specific, prior information that the suspect may create an exigency, or that in the moment they were "'confronted with some sort of contemporaneous sound or activity alerting them' to the possible presence of an exigent circumstance." *Coyle*, 95 Wn.2d at 10 (quoting *State v. Mueller*, 15 Wn. App. 667, 670, 552 P.2d 1089 (1976)). It is the State's burden to show compliance or exigent circumstances excusing noncompliance. *Muhammad*, 194 Wn. App. at 596. "'The proper remedy for an unexcused violation is suppression of the evidence obtained by the violation.'" *Ortiz*, 196 Wn. App. at 308 (quoting *Coyle*, 95 Wn.2d at 14).

We review de novo the conclusions of law entered in connection with a suppression order. *Cardenas*, 146 Wn.2d at 407. We defer to the trial court's assessment of conflicting evidence and

witness credibility. *State v. Edwards*, 20 Wn. App. 648, 652, 581 P.2d 154 (1978); *State v. Johnson*, 94 Wn. App. 882, 889-90, 974 P.2d 855 (1999). However, such evidence must still be "constitutionally sufficient" in order to sustain a finding of exigent circumstances. *Edwards*, 20 Wn. App. at 652.

    2.    <u>Whether the police complied with the knock and announce rule</u>

The trial court concluded that the warrant was properly served because the officers announced themselves and their purpose, and they waited a reasonable amount of time under the circumstances before breaching the door. Sexton focuses on the fact that the officer who announced the police's arrival over the loudspeaker testified that he told the occupants of the house to "get on the ground," rather than to "open the door." Br. of Appellant at 15-16 (emphasis omitted). But the rule does not require that the police literally knock on the door and demand entry in every case. Rather, the relevant inquiry is whether the officers' actions effectuated the purposes of the rule. *Richards*, 136 Wn.2d at 372-73. "A police officer who identifies himself and announces that he has a search warrant has implicitly demanded admission." *Johnson*, 94 Wn. App. at 889.

Multiple officers testified that the loudspeaker announcements identified the officers as police and stated that they had a search warrant. This testimony supported the trial court's finding that the officers informed the occupants of Sexton's home "of their presence, their identity, their purpose for being there, and [demanded] admittance." CP at 126. This announcement was similar to the announcement found sufficient in *Richards*, where the officers said simply, "'Police. We have a search warrant.'" 136 Wn.2d at 372. It is clear that the officers here adequately announced themselves and their purpose and at least implicitly demanded admission by telling the occupants that they had a search warrant and to get on the ground. The announcement was broadcast over a

SWAT van loudspeaker. It was reasonable for the officers to conclude that the occupants of Sexton's home were on notice of their presence and purpose. *See id.* at 377-78.

Turning to the reasonableness of the delay before entry, the trial court found that "[a]pproximately [15] seconds elapsed between the time Deputies began making their PA system announcements" and the breach. CP at 126. Although there was conflicting testimony on how much time elapsed, the officer that made the announcements over the loudspeaker testified that the delay was 15 seconds, and the trial court found this testimony to be credible. This testimony adequately supported the trial court's finding of an approximately 15-second delay between the announcement and entry, particularly in light of the deference we give to the court's assessment of witness credibility when there is conflicting evidence. *See Johnson*, 94 Wn. App. at 889. The *Johnson* court found a delay of 5 to 10 seconds to be reasonable where, as here, the police reasonably believed there was a danger that evidence was being destroyed. *Id*. at 890-91. And as the court explained in *Richards*, the knock and announce rule does not require the police to wait longer when doing so would be futile: "To wait for grant or denial of admission after an occupant has been made aware of a police officer's presence and purpose would serve no logical purpose. The police officer is already authorized by the search warrant to enter the premises without permission from the occupant." 136 Wn.2d at 378.

Given the factually dependent nature of the inquiry, we defer to the trial court's evaluation of witness credibility, and we agree with the trial court that a delay of several seconds was reasonable under the circumstances. It would have served no logical purpose for the officers to delay their entry any longer where they were already broadcasting their presence and purpose over a loudspeaker.

Under the circumstances, the police adequately announced their presence and purpose, and a reasonable delay occurred before they breached Sexton's door. Accordingly, there was no violation of the knock and announce rule.

3.     Whether exigent circumstances justified immediate entry

Even if the police had not strictly complied with the knock and announce rule, the trial court explicitly concluded that exigent circumstances justified immediate entry into the home. The trial court found that the warrant had been classified as high risk and necessitated SWAT involvement, someone on the porch of Sexton's home saw the police arrive, the police were looking for evidence that could easily and quickly be destroyed, the police had been advised that there was a large dog on the property, and Sexton was known to carry a firearm. Sexton challenges these findings and argues that they did not support the trial court's legal conclusions regarding exigency. We disagree.

In *Cardenas*, the Washington Supreme Court held that exigent circumstances existed where the officers reasonably believed the occupants were armed, the officers were aware that the occupants had recently used force against their robbery victims, the officers observed the occupants running away from the door, and the evidence was easily disposable. 146 Wn.2d at 412. The court reasoned that under these circumstances it was reasonable for the officers to be concerned that the suspects would attempt to escape, confront the officers, or try to destroy evidence, and so the knock and announce requirement was excused. *Id.*

In *Edwards*, police serving a search warrant for drugs knocked on the door and saw a man appear at a nearby window and then quickly disappear. 20 Wn. App. at 649. The officers then announced their presence and purpose, but did not wait for a response and instead immediately

kicked down the door. *Id.* at 649-50. We held that the fact that somebody saw the officers through a window and then moved away, even when combined with the "perishable nature of the evidence," did not justify a finding of exigent circumstances. *Id.* at 652. We reasoned that there was no other evidence of unusual activity, noise, or conduct indicating an exceptional situation. *Id.*

In *State v. Johnson*, 11 Wn. App. 311, 312, 522 P.2d 1179 (1974), the defendant saw police arresting his friend outside his home and then quickly went inside. The police thought the defendant might have been getting a weapon to stop the arrest and ran up to the door. *Id.* The officers could see through the door that the defendant had not obtained a weapon but, nevertheless, immediately entered the home and found a variety of stolen property. *Id.* Division One of this court held that although there initially existed exigent circumstances, they were no longer present once the officers could see that the defendant was not acting suspiciously. *Id.* at 318-19.

Sexton relies on *State v. Dugger*, 12 Wn. App. 74, 528 P.2d 274 (1974) and *State v. Jeter*, 30 Wn. App. 360, 634 P.2d 312 (1981). In *Dugger,* Division One noted that the mere possibility of destruction of evidence is insufficient to create an exigent circumstance, and although concern for officer safety can create the requisite exigency, such concern must be supported by "[s]ome credible evidence, such as knowledge that the occupants might possess weapons and be predisposed to respond violently." *Id.* at 83. In *Jeter*, we similarly held that the mere knowledge that a convicted felon kept a gun by his bed was insufficient to show exigent circumstances absent specific information that the defendant was predisposed to use the gun, and the risk of destruction of evidence was likewise an insufficient basis because there was no evidence to suggest that the defendant might destroy contraband. 30 Wn. App. at 362.

Here, the police did not have any prior specific information that Sexton was predisposed to violence or that the occupants were likely to destroy evidence. However, unlike in *Dugger* and *Jeter*, the police's risk assessment called for the deployment of a SWAT team based on a variety of factors that were predetermined to pose threats to officer safety. Also unlike in *Dugger* and *Jeter*, the officers saw someone on the porch recognize them as police officers and immediately bolt inside. Deputy Philip Wylie testified that it was obvious that the person on the front porch had seen the police approach the house and then went inside in a hurry. Deputy Derek Nielsen testified that the man on the porch "obviously saw us and made the decision to bolt, run back into the house and slam the door." 1 VRP (Feb. 13-14, 2018) at 54. Nielsen believed this was why another officer called "compromise." *Id.* The trial court found the testimony of each officer credible.

The court in *Johnson* concluded that a similar event there initially created exigent circumstances. 11 Wn. App. at 318-19. The difference is that in *Johnson*, the exigency dissipated when the officers saw the defendant through an open door, whereas here, the officers could not see inside the house and did not know whether the occupants were destroying evidence or arming themselves. And the fact that the man on the porch "bolt[ed]" inside and "slam[med] the door" distinguishes this case from *Edwards*, where the occupant merely appeared at a window and then quickly moved away, apparently with no other indication that he was alarmed by police presence. 1 VRP (Feb. 13-14, 2018) at 54; *Edwards*, 20 Wn. App. at 650.

Instead, this case is similar to *State v. Carson*, 21 Wn. App. 318, 322, 584 P.2d 990 (1978), where the officers' forcible entry was justified because they had prior information that the defendant kept a shotgun by his door for protection and saw the defendant quickly close the door and move away when he saw the officers approach. The *Carson* court reasoned that the officers

14

could reasonably have interpreted the defendant's actions "as creating a risk that evidence would be destroyed or that officers' lives were in danger." *Id.*

Although the officers here did not have information that any of the occupants of the house had recently used force against anyone, they reasonably suspected that there would be electronic surveillance, firearms, and a large dog in the house, the evidence sought was easily disposable, and they witnessed activity that suggested that the occupants may attempt to flee, destroy evidence, or confront the officers. *See Cardenas*, 146 Wn.2d at 412; *see also State v. Wilson*, 9 Wn. App. 909, 914-16, 515 P.2d 832 (1973) (holding that forcible entry was reasonable where informants told the police that the defendant was armed with a pistol and had other firearms, the officers knew the defendant had several narcotic convictions, and there was a concern that evidence would be destroyed). There was testimony that the specific evidence sought was easily disposable, and in the officers' experience, suspects have frequently tried to dispose of drugs in these circumstances. The trial court's findings on the justification for using a SWAT team were therefore supported by substantial evidence, and those findings supported its conclusion that exigent circumstances justified immediate entry into Sexton's home.

Viewing the totality of the circumstances, it was reasonable for the police to conclude that the man on the porch had fled inside to warn the other occupants to destroy or hide evidence or to prepare to physically confront the officers. In light of the police's threat assessment and the officers' perceived danger to their safety, it was reasonable for the officers to conclude that taking additional time to knock and announce could have endangered officer safety and inhibited the effective investigation of the crime. *See Cardenas*, 146 Wn.2d at 411. The trial court was convinced by the officers' testimony that the operation was compromised when the man on the

porch saw them and ran inside, and we defer to that determination of credibility. *Johnson*, 94 Wn. App. at 889. For these reasons, we hold that exigent circumstances also justified the officers' entry several seconds after they announced their presence.

B.        Probable Cause and Staleness

Sexton next argues that although probable cause existed when the search warrant was originally granted, it had become stale by the time the police executed the warrant nine days later. We disagree.

A search warrant may only issue upon a determination of probable cause. *State v. Youngs*, 199 Wn. App. 472, 475, 400 P.3d 1265 (2017). Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that a person is probably involved in criminal activity and the evidence of the crime could be found in the place to be searched. *State v. Constantine*, 182 Wn. App. 635, 646, 330 P.3d 226 (2014).

CrR 2.3(c) provides that a warrant "shall command the officer to search within a specified period of time not to exceed 10 days." A delay in executing the warrant may render the determination of probable cause stale. *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). "The information is not stale for purposes of probable cause if the facts and circumstances in the affidavit support a commonsense determination that there is continuing and contemporaneous possession of the property intended to be seized." *Id.* at 506. A court evaluates staleness by looking at the totality of circumstances, including the amount of time between the warrant's issuance and execution and the nature and scope of the suspected criminal activity and property to be seized. *State v. Lyons*, 174 Wn.2d 354, 361, 275 P.3d 314 (2012).

Sexton relies in part on *Maddox*. In that case, probable cause was based on an informant's statement that he had bought methamphetamine from the defendant, and the defendant indicated that he may have more to sell if the informant returned with cash. *Maddox*, 152 Wn.2d at 503. The search warrant authorized police to search for methamphetamine and any paraphernalia or other evidence related to the manufacture, sale, and distribution of methamphetamine. *Id.* Nine days later, the informant returned with cash, but the defendant told him he did not have any methamphetamine at the moment and the informant would have to come back in a few days. *Id.* at 504. The police executed the warrant the following day, seizing evidence of methamphetamine sales but no methamphetamine. *Id.*

The defendant argued probable cause was rendered stale not only because of the 10-day delay in executing the warrant, but also because police had learned new information that negatively impacted probable cause and did not return to the magistrate for a redetermination of probable cause. *Id.* at 506-07. The Washington Supreme Court held that where new information arises that undermines probable cause, return to the magistrate for reevaluation is required. *Id.* at 508. This portion of *Maddox* is not helpful to Sexton. The *Maddox* court ultimately held that the search and seizure were still valid because probable cause remained for the paraphernalia and other evidence of an ongoing operation to sell and distribute methamphetamine. *Id.* at 512-13.

The warrant here was served within the 10-day time limit of CrR 2.3(c) and within the time limit stated in the warrant. The trial court reasoned that the location of the drug operation in a single-family home suggested it was an ongoing operation instead of a transitory one. And the informant told police that Sexton sold methamphetamine regularly. Unlike in *Maddox*, here the

police received no new information to suggest that Sexton no longer had any drugs. For these reasons, the warrant was not stale with regard to the search for methamphetamine.

Moreover, the informant stated that Sexton owned a scale and baggies that he used for such transactions, as well as a handgun. Even if we assumed that probable cause became stale with respect to the methamphetamine, under *Maddox* it still existed with respect to this other evidence that the police sought. Given their informant's information and the nature of the suspected crime of selling methamphetamine, it was reasonable for the police to expect that Sexton's possession of the handgun, scale, packaging materials, and other possible evidence related to the sale of methamphetamine was continuous and ongoing.

Sexton also argues we should follow an Indiana case, *Huffines v. State*, 739 N.E.2d 1093 (Ind. Ct. App. 2000). There, the police executed a warrant to search the defendant's house for cocaine about a week and a half after an informant bought cocaine from the defendant. *Id.* at 1094. On appeal, the court determined probable cause had dissipated because it had been based on a single, isolated transaction and there was no evidence the activity was ongoing. *Id.* at 1099. Here, in contrast, the informant told police that Sexton regularly sold methamphetamine, and the trial court legitimately reasoned that drug sales out of a residence could reasonably be perceived as more permanent than sales from other locations.

We hold that the nine-day period between the informant's visit to the house and the execution of the warrant did not render probable cause stale. Considering the nature of the suspected crime and the information provided by the informant, it was reasonable to expect that Sexton's possession of the items listed in the search warrant was continuous and ongoing.

## II. SEXTON'S RIGHT TO REPRESENT HIMSELF

Sexton argues the trial court violated his constitutional right to represent himself by denying his motion to proceed pro se. We disagree.

A.     Right of Self-Representation

Both the federal and state constitutions provide that defendants have the right to represent themselves. *State v. Curry*, 191 Wn.2d 475, 482, 423 P.3d 179 (2018). The unjustified denial of this right requires reversal. *State v. Burns*, 193 Wn.2d 190, 202, 438 P.3d 1183 (2019).

This right is neither self-executing nor absolute—the defendant must unequivocally and timely request to proceed pro se. *Curry*, 191 Wn.2d at 482. "This requirement protects defendants from inadvertently waiving assistance of counsel and protects trial courts from 'manipulative vacillations by defendants regarding representation.'" *Id.* at 483 (quoting *State v. DeWeese*, 117 Wn.2d 369, 376, 816 P.2d 1 (1991)).

For this reason, courts must "indulge in 'every reasonable presumption' against a defendant's waiver of [their] right to counsel." *Burns*, 193 Wn.2d at 202 (internal quotation marks omitted) (quoting *In re Det. of Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999)). "[E]ven with this presumption, a trial court may deny a request to proceed pro se only if the request is 'equivocal, untimely, involuntary, or made without a general understanding of the consequences.'" *Id.* at 202-03 (emphasis omitted) (quoting *State v. Madsen*, 168 Wn.2d 496, 505, 229 P.3d 714 (2010)). This determination entails a multistep process: first the court determines whether the request is unequivocal and timely, and if it is, then the court asks whether the request is knowing, intelligent and voluntary. *Id.* at 203.

We review a trial court's grant or denial of a motion to proceed pro se for abuse of discretion. *Id.* at 202. "A trial court abuses its discretion if the decision is manifestly unreasonable such that no reasonable mind could come to that decision, if the decision is not supported by the facts, or if the judge applied an incorrect legal standard." *Id.* Absent an abuse of discretion, we will not reverse a trial court's decision, even if we may have reached a different conclusion on de novo review. *Curry*, 191 Wn.2d at 486.[1] We accordingly give great deference to the trial court's discretion due to the trial court's experience in evaluating requests to proceed pro se, its favorable position compared to appellate courts to observe and evaluate the defendant, and the inherently fact-specific nature of the inquiry. *Id.* at 484-85.

B.      Whether the Trial Court Abused Its Discretion

Sexton argues that the trial court erred in its conclusions that his request to proceed pro se was untimely, equivocal, and unintelligent. We hold that the record supports the trial court's conclusion that Sexton's request was equivocal, and so the court did not err in denying the request.

1.      Whether Sexton's request was timely and unequivocal

a.      Timeliness

The trial court concluded that Sexton's request to proceed pro se was both untimely and equivocal. We need only uphold one of those determinations to affirm the trial court's denial of Sexton's motion. *See State v. Stenson*, 132 Wn.2d 668, 740, 940 P.2d 1239 (1997) ("Even if we

---

[1] Sexton urges us to review this issue de novo, citing Justice Gordon McCloud's concurrence in *Curry*, 191 Wn.2d at 505-11 (Gordon McCloud, J., concurring). However, it is clear from our Supreme Court's recent decisions that we are bound to apply an abuse of discretion standard. *E.g.*, *Burns*, 193 Wn.2d at 202.

decided, which we do not, that the request to proceed pro se so late in the proceedings was timely, we concur with the trial court's conclusion that the request was equivocal.").

> [T]imeliness is determined on a continuum:
> "If the demand for self-representation is made (1) well before the trial or hearing and unaccompanied by a motion for a continuance, the right of self[-]representation exists as a matter of law; (2) as the trial or hearing is about to commence, or shortly before, the existence of the right depends on the facts of the particular case with a measure of discretion reposing in the trial court in the matter; and (3) during the trial or hearing, the right to proceed pro se rests largely in the informed discretion of the trial court."

*Madsen*, 168 Wn.2d at 508 (emphasis omitted) (quoting *State v. Barker*, 75 Wn. App. 236, 241, 881 P.2d 1051 (1994)).

Here, the case was called for trial and motions in limine were addressed. Perhaps because the trial court denied his motions to exclude evidence, Sexton fired his attorney and sought to represent himself the next morning just before jury selection was set to begin. The trial court ruled that Sexton's request was untimely because Sexton's request came after the court had called the case for trial and denied Sexton's suppression motion, and the court found there was a rational basis for concluding the request was made primarily for the purpose of delaying the proceedings.

Sexton argues this conclusion was unsupported by the record because he did not seek a continuance, citing *State v. Watkins*, 25 Wn. App. 358, 362, 606 P.2d 1237 (1980). There is little evidence in the record of whether Sexton was trying to delay the proceedings, other than his indication that he was seeking the assistance of another attorney. Indeed Sexton expressed frustration at the number of continuances sought by counsel. There accordingly may not be support in the record for the court's conclusion that Sexton's request was intended to cause delay.

Nevertheless, because Sexton's request was made after the case was called for trial and on the day that jury selection was set to begin, the trial court had discretion to determine whether

granting the request was appropriate. In *Madsen*, the Supreme Court held that such a request was timely because the trial court had been given significant advance notice that the defendant wished to proceed pro se. 168 Wn.2d at 507-08. Here, in contrast, there was no indication such a request was forthcoming until the day of jury selection. As a result, we afford the trial court significant discretion to deny the request under *Madsen*.

b.     Equivocation

The trial court separately concluded that Sexton's request was equivocal because Sexton indicated that he was hoping to get help from a different attorney in Seattle and said only that "[a]t this time" he wanted to proceed pro se. 2 VRP (Feb. 15, 2018) at 7. This reasoning is supported by the record, and in light of the discretion afforded the trial judge, we uphold the trial court's denial of Sexton's motion on this basis.

In determining whether a request is equivocal, courts must examine the nature of the request. *Curry*, 191 Wn.2d at 489. "Relevant considerations include whether the request was made as an alternative to other, preferable options and whether the defendant's subsequent actions indicate the request was unequivocal." *Id.*

The record supports the trial court's conclusion that Sexton was equivocal in his request, especially in light of the necessary deference to the trial court's evaluation of Sexton's request after a long colloquy. Sexton did not file a formal motion, but rather told the court just before jury selection that he wanted to fire his attorney and represent himself "[a]t this time." 2 VRP (Feb. 15, 2018) at 7. Sexton said he wanted to proceed pro se, but also discussed at length his frustrations with the proceeding up to that point and the emotional turmoil he was going through, saying he was "reluctantly" firing his attorney. *Id.* at 8. Finally, Sexton did not seek a continuance, and

instead indicated that the reasons he wanted to fire his attorney were his personal disagreements with the attorney, frustrations over numerous delays in the proceeding, the court's denial of his suppression motion, and the fact that he could no longer afford to pay the attorney.

Importantly, Sexton had already attempted to contact an attorney in Seattle that he indicated would assist him. Although an alternative request for new counsel does not necessarily render a request to proceed pro se equivocal, it "'may be an indication to the trial court, in light of the whole record, that the request is not unequivocal.'" *Curry*, 191 Wn.2d at 489 (quoting *Stenson,* 132 Wn.2d at 740-41).

These reasons supported the trial court's conclusion that Sexton did not necessarily want to proceed pro se, but merely wanted a different attorney. It was reasonable for the court to conclude that Sexton was not certain he wanted to proceed pro se for the remainder of his case. The trial court did not abuse its discretion when it concluded that Sexton's request was equivocal and denied his motion to proceed pro se.

### III. CONSTRUCTIVE POSSESSION JURY INSTRUCTIONS

Sexton argues that the trial court's instructions to the jury defining "dominion and control" as it related to the crimes of possession of methamphetamine and possession of a firearm constituted an impermissible comment on the evidence. We disagree.

A.      Judicial Comments on the Evidence

Article IV, section 16 of the Washington Constitution prohibits judges from conveying to the jury their personal attitudes regarding the case "or instructing a jury that 'matters of fact have been established as a matter of law.'" *State v. Jackman*, 156 Wn.2d 736, 743-44, 132 P.3d 136 (2006) (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). A jury instruction that

"essentially resolve[s] a contested factual issue" amounts to an improper judicial comment because it "effectively relieve[s] the prosecution of its burden of establishing an element of the [crime]." *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015). In contrast, a jury instruction that merely states the law does not constitute an impermissible comment on the evidence. *Id*.

We review jury instructions de novo, within the context of the instructions as a whole. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). If we conclude a jury instruction amounted to an improper comment on the evidence, we presume the error to be prejudicial and the State bears the burden of showing that no prejudice could have resulted. *Id.* at 725.

B.      Whether the Trial Court's Instructions on Dominion and Control Were Improper

Sexton argues that the trial court erred in defining "dominion and control" in its jury instructions on possession of controlled substances and a firearm. The instructions informed the jury that possession can be actual or constructive, and constructive possession occurs when there is dominion or control over the item. The jury instructions continued:

> In deciding whether the defendant had dominion and control over [an item], you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the ability to take actual possession of the [item], whether the defendant had the capacity to exclude others from possession of the [item], and whether the defendant had dominion and control over the premises where the [item] was located. No single one of these factors necessarily controls your decision.

CP at 61, 76. These instructions were based on Washington Pattern Jury Instructions 50.03 and 133.52. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 50.03, 133.52 (2016).

Sexton argues these jury instructions were improper because they defined the contours of dominion and control by relying on tests developed in case law for evaluating sufficiency of the

evidence. In developing the pattern instructions that established the instructions given in this case, the Washington Pattern Instructions Committee noted that appellate courts analyze "possession" in part by deciding whether the evidence was sufficient to convict in a particular case. WPIC 50.03.

Sexton relies on *Brush*, where the Washington Supreme Court stated that "legal definitions should not be fashioned out of courts' findings regarding legal sufficiency." 183 Wn.2d at 558. There, the jury was tasked with determining whether the offense was part of an ongoing pattern of abuse over "'a prolonged period of time.'" *Id.* at 555. The trial court used a pattern instruction defining "a prolonged period of time" as longer than two weeks, based on prior case law that determined that two weeks was not legally sufficient to be a prolonged period of time. *Id.* at 557-58. *Brush* held that the jury instruction was a comment on the evidence because it resolved a factual question for the jury and relieved the State of its burden to prove that the pattern of abuse occurred over a prolonged period of time. *Id.* at 559.

In *State v. Sandoval*, we cautioned that *Brush*'s admonition that legal definitions not be based on rulings on legal sufficiency "should not be read in isolation." 8 Wn. App. 2d 267, 279, 438 P.3d 165 (2019). Rather, "the reason for this admonition is because appellate courts review the sufficiency of evidence for whether any rational jury could have found guilt beyond a reasonable doubt and construe facts in the light most favorable to the state, while juries must find guilt beyond a reasonable doubt." *Id.* at 278-79. "'Therefore, fashioning a jury instruction based on an appellate court's sufficiency holding effectively replaces the jury standard with the lesser appellate standard.'" *Id.* at 279 (quoting *State v. Sinrud*, 200 Wn. App. 643, 651, 403 P.3d 96 (2017)).

In *Sinrud*, the trial court instructed the jury that to convict the defendant of possession of a controlled substance with intent to deliver, the law requires substantial corroborating evidence of such intent. 200 Wn. App. at 650. The instruction continued, "'The law requires at least one additional corroborating factor.'" *Id.* (emphasis omitted). Division One of this court held this last sentence was a comment on the evidence because it improperly implied that the presence of only one additional factor necessarily meant that the jury should find intent. *Id.* at 651.

Sexton argues that the trial court here made the same error as in *Sinrud*, claiming that by instructing the jury that no single factor necessarily controls the jury's decision, the court implied that a single factor may control the jury's decision. But unlike *Sinrud*, the trial court here did not tell the jury that a certain number of factors was required. Rather, the court told the jury that it did not even have to consider the factors listed and was free to consider other factors.

Unlike the jury instructions in *Brush* and *Sinrud*, the instructions here did not resolve the factual issue of dominion and control for the jury. Although the instructions were based in part on sufficiency of the evidence case law, they did not compel the jury to make a specific determination of whether Sexton had dominion and control over the methamphetamine or the firearm. The instructions correctly stated that there are several possible indicia of dominion and control, any or none of which the jury *may consider* along with all of the relevant circumstances in the case, and none of which necessarily controlled the jury's decision. The trial court did not indicate that any one of the factors listed would be sufficient to convict, and so did not make the same error as the trial courts in *Brush* and *Sinrud* by replacing the jury standard with the lesser appellate standard.

We hold that the challenged jury instructions did not constitute improper judicial comment on the evidence.

IV. SENTENCING ISSUES

A.    Incorrect Maximum Sentence

Sexton argues that the trial court improperly sentenced him to 85 months on his conviction for possession of methylphenidate with intent to deliver, because the maximum sentence on that count, a class C felony, should have been 5 years, not 10 years. RCW 9A.20.021(1)(c); RCW 69.50.401(2)(c). The State says that the trial court incorrectly identified this conviction as a class B felony. However, the State argues that Sexton does not need to be resentenced because, based on his criminal history, the trial court should have doubled the statutory maximum sentence, so 10 years ultimately was the correct maximum sentence.

"Any person convicted of a second or subsequent offense under [chapter 69.50 RCW] may be imprisoned for a term up to twice the term otherwise authorized." RCW 69.50.408(1). An offense is considered a second or subsequent offense if the defendant was ever previously convicted under chapter 69.50 RCW "or under any statute of the United States or of any state relating to narcotic drugs, marihuana, depressant, stimulant, or hallucinogenic drugs." RCW 69.50.408(2). The Washington Supreme Court recently held that RCW 69.50.408 automatically doubles the maximum sentence. *State v. Cyr*, 195 Wn.2d 492, 504, 461 P.3d 360 (2020).

Sexton's criminal history lists multiple prior felony convictions for possession of a controlled substance. However, it is unclear from the record the statutory basis for these convictions. In *Cyr*, the Supreme Court remanded for the trial court to determine whether the defendant had a qualifying prior conviction under RCW 69.50.408(2). *Id.* at 511.

We do the same. The trial court should determine on remand whether Sexton's prior convictions implicate the statute's doubling provision. If Sexton's prior convictions for unlawful

possession of a controlled substance arose under chapter 69.50 RCW "or under any statute of the United States or of any state relating to narcotic drugs, marihuana, depressant, stimulant, or hallucinogenic drugs," then the maximum sentence for his methylphenidate conviction doubled automatically from 5 years to 10 years and the maximum sentence reflected on the judgment and sentence, 10 years, is correct. RCW 69.50.408(2). If not, the sentence imposed for count II, 85 months, would exceed the statutory maximum of 5 years and resentencing would be required.

B.      Condition of Community Custody

Sexton next challenges the trial court's community custody order that Sexton have no contact with drug users or sellers. Sexton reasons that the record makes clear that the trial court intended to forbid him from *knowingly* associating with drug users or sellers. That is what the State requested and what the court stated it would order. The State concedes that the trial court erred in this regard and agrees we should remand to correct this community custody provision.

It is clear from the record that the trial court intended to limit Sexton's contact only with those he knows to be drug users or sellers. We remand for the trial court to make this correction.

C.      Legal Financial Obligations

Sexton argues the criminal filing fee and DNA collection fee were improperly imposed. The State concedes that both fees were improper. We agree.

RCW 36.18.020(2)(h) prohibits the imposition of the criminal filing fee if a defendant is indigent as defined in RCW 10.101.010(3) (a)-(c). RCW 43.43.7541 authorizes the imposition of a DNA collection fee "unless the state has previously collected the offender's DNA as a result of a prior conviction."

The State concedes that the trial court found Sexton indigent, Sexton's DNA is on file with the Washington State Patrol Crime Laboratory, and these statutes apply. We accordingly remand for the trial court to strike the DNA collection fee and criminal filing fee.

Sexton also argues that the trial court improperly imposed a community supervision fee. RCW 9.94A.703(2)(d) governs supervision fees and states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [Department of Corrections]." The supervision fee is a discretionary financial obligation. *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018), *review denied*, 193 Wn.2d 1007 (2019).

However, the supervision fee is not a discretionary "cost" merely because it is a discretionary financial obligation. Rather, the supervision fee fails to meet the RCW 10.01.160(2) definition of a "cost" because it is not an expense specially incurred by the State to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision. Because the supervision fee is not a "cost" as defined under RCW 10.10.160, the statutes do not prohibit the trial court from imposing the fee even where a defendant is indigent.

We note, however, that "[t]he barriers that [legal financial obligations] impose on an offender's reintegration to society are well documented . . . and should not be imposed lightly merely because the legislature has not dictated that judges conduct the same inquiry required for discretionary costs." *State v. Clark*, 191 Wn. App. 369, 376, 362 P.3d 309 (2015). We agree that this important policy should be broadly supported. Therefore, we encourage the trial court on remand to reexamine the imposition of the supervision assessment fee.

V. STATEMENT OF ADDITIONAL GROUNDS

A.      Ineffective Assistance of Counsel

Sexton argues that he received ineffective assistance of counsel in several respects. We reject each of his arguments.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To demonstrate that he received ineffective assistance of counsel, Sexton must show both that defense counsel's performance was deficient and that the deficient performance resulted in prejudice. *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Prejudice ensues if the result of the proceeding would have been different had defense counsel not performed deficiently. *Id*. Because both prongs of the ineffective assistance of counsel test must be met, the failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

We strongly presume that defense counsel's performance was not deficient. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). To overcome this presumption, the defendant must show "'the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Id.* (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)).

1.      Stipulation to prior serious offenses

Sexton argues counsel was ineffective for convincing him to stipulate that he had a prior serious offense, a necessary element for his conviction of first degree unlawful possession of a

firearm. *See* RCW 9.41.040(1)(a). Sexton argues that counsel should have instead requested an instruction on second degree unlawful possession of a firearm, which does not include the element of having a prior serious offense. He argues counsel was deficient for failing to argue that his prior conviction for second degree burglary was not a serious offense and so could not have formed the basis of raising his firearm conviction to the level of first degree. We reject these arguments.

RCW 9.41.010(27)(a) defines "'[s]erious offense'" as including "[a]ny crime of violence." RCW 9.41.010(4)(a) identifies "second degree burglary" as a crime of violence. It is therefore clear that Sexton's prior conviction for second degree burglary qualified as a serious offense for the purposes of his conviction for first degree unlawful possession of a firearm. Sexton points out that this definition is inconsistent with RCW 9.94A.030(56), which does not include second degree burglary in its definition of "'[v]iolent offense.'" But the applicable definition here is not the one defining "violent offense" in RCW 9.94A.030(56), but the one defining "crime of violence" under RCW 9.41.010(4)(a). Counsel was not deficient on this basis.

Sexton also suggests it was improper for the prosecutor to refer to his prior offenses during the State's opening statement because Sexton had not yet signed the stipulation at that time, citing *State v. Humphries*, 181 Wn.2d 708, 336 P.3d 1121 (2014). He claims therefore that defense counsel was deficient for failing to contest the existence of a prior serious offense. But the State had other evidence of Sexton's criminal history and did not need to rely on Sexton's stipulation. Sexton does not explain how, absent his stipulation, the State would have been unable to prove the existence of a prior serious offense. Sexton therefore has not shown that counsel was deficient or that this issue would have resolved differently had counsel challenged this particular point.

2. <u>Failure to object to prosecutorial misconduct</u>

Sexton next argues that counsel was deficient for failing to object to an alleged instance of prosecutorial misconduct during the State's closing argument. We disagree.

Arguments that shift or misstate the State's burden of proving guilt beyond a reasonable doubt constitute prosecutorial misconduct. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). We review a prosecutor's closing argument "in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions." *State v. Curtiss*, 161 Wn. App. 673, 699, 250 P.3d 496 (2011). "During closing argument, a prosecutor has 'wide latitude in drawing and expressing reasonable inferences from the evidence.'" *Id.* (quoting *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991)).

Sexton claims the State misstated its burden of proof when it analogized the evidence presented at trial to pieces of a jigsaw puzzle and explained that the jury's job was to determine whether there were enough pieces of the puzzle to find Sexton guilty of the charges beyond a reasonable doubt. Sexton claims this comment was improper when read together with the State's later statement that, similar to the question of possession, the question of whether the crimes occurred in the state of Washington was not a "close call." 5 VRP (Feb. 28, 2018) at 16. According to Sexton, these statements trivialized the State's burden of proof and constituted misconduct.

An analogy to jigsaw puzzles in closing argument is permissible if the prosecutor "made no reference to any number or percentage and merely suggested that one could be certain of the picture beyond a reasonable doubt even with some pieces missing." *Lindsay*, 180 Wn.2d at 436. Such an analogy becomes improper when the prosecutor uses it to somehow quantify the standard of proof. *Id.* Here, the prosecutor merely stated that the jury had to determine if enough pieces

were present to find Sexton guilty beyond a reasonable doubt. This was not a misstatement of the State's burden of proof under *Lindsay*.

As for the State's reference to the element of possession when discussing whether the acts occurred in Washington, this statement also did not improperly misstate or trivialize the State's burden to prove Sexton's crimes beyond a reasonable doubt. In the context of the prosecutor's entire closing argument, it is clear that he was merely arguing that the State had definitively met its burden to show the elements of possession beyond a reasonable doubt and the acts in question occurred in Washington. Given the prosecutor's wide latitude to argue reasonable inferences from evidence, we hold these comments were not improper. Defense counsel was therefore not deficient for not objecting.

       3.      <u>Failure to argue same criminal conduct</u>

Finally, Sexton argues counsel was deficient for failing to argue that some of his prior convictions constituted same criminal conduct, and Sexton should have been sentenced with a lower offender score. This argument relies on information outside the record and we do not consider it.

B.      <u>Cumulative Error</u>

Sexton also argues that cumulative error requires reversal, based on the alleged errors he describes in his SAG. As discussed above, Sexton has not shown that counsel was ineffective. Because Sexton has not identified any errors, reversal is not required.

CONCLUSION

We affirm Sexton's convictions. We remand for the trial court to strike the improper legal financial obligations, reexamine the imposition of the supervision assessment fee, correct the

challenged community custody condition to prohibit Sexton from *knowingly* associating with drug users or sellers, and determine whether Sexton had a qualifying prior conviction under RCW 69.50.408(2) and resentence him if necessary.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Maxa, J.

Sutton, A.C.J.